RANK et al. v. KRUG et al., and four other cases.

Civ. Nos. 685-ND, 668-ND, 681-ND, 680-ND, 832-ND.

United States District Court
S. D. California, N. D.
April 13, 1950.

Claude L. Rowe, Fresno, Cal., for plaintiffs Hollister Land & Cattle Co., Everett G. Rank, Northern California Fisheries and others.

Kellas, Lamberson & Thomas, Fresno, Cal., by Edward L. Kellas, Fresno, Cal., for plaintiff Josephine Jasper.

N. Lindsay South, Fresno, Cal. and James C. Janjigian, Fresno, Cal., for plaintiffs Cervelli.

Ernest A. Tolin, United States Attorney, Los Angeles, Cal., Francis B. Critchlow, Special Assistant to the Attorney General, Irl D. Brett, Special Assistant to the Attorney General, Ralph S. Boyd, Attorney, Department of Justice, Washington, D. C., for defendants Michael W. Straus, Richard Boke, Martin Blote, R. K. Durant, Julius A. Krug.

Stephen W. Downey, Sacramento, Cal., for defendant Madera Irr. Dist.

Edwin P. Jacobsen, Delano, Cal., for defendant South San Joaquin Municipal Utilities Dist.

HALL, District Judge.

On September 25, 1947, the plaintiff, Rank, and eleven others filed this suit in the Superior Court of the State of California, in Fresno County. On motion of the United States Attorney the case was removed to this court on October 6, 1947. No motion for remand has ever been made. And it appears, upon examination of the complaint, that the case was properly removed and should not be remanded. Amendments to the complaint were filed September 16, 1949, September 30, 1949, and on March 8, 1950. Motions to dismiss had been filed previous to the amendments, but by agreement of the parties the motions to dismiss were deemed to be filed and to apply to the complaint as amended. They were thus treated in the briefs and in the arguments, and will be so considered in this decision.

The complaint, as originally filed, alleged violation of the plaintiffs' constitutional rights. Upon the briefs the precise constitutional questions relied upon were not clear. The matter was set down for

hearing for clarification and counsel for both parties agreed that constitutional questions were raised which required a three-judge court. The three-judge court was convened and hearing set for March 8, 1950, at which time the amendment of March 8th to the complaint was filed, which specifically challenged various Acts of Congress listed therein. After argument on the question as to whether or not it was properly a case for a three-judge court, that court held it was not, as no substantial question concerning the enforcement, operation, or execution of any *Act of Congress* for repugnance to the Constitution was involved. The three-judge court then dissolved, leaving this case and the related ones pending before this court.[1] It will be necessary, however, to consider said Acts of Congress in the determination of the questions involved herein. The material portions of the challenged acts, as well as others, are set forth in Appendix A.

The complaint named as defendants, in their official capacity as well as individually, Julius A. Krug, the then Secretary of the Interior of the United States, and the following persons holding the following offices in the United States Bureau of Reclamation, viz.: Michael W. Straus, Commissioner; Richard Boke, Regional Director; Martin Blote, Regional Water Master; Jack Rodner, District Manager; R. K. Durant, Construction Engineer and Resident Engineer. Also named as defendants were the Madera Irrigation District and its Directors; the South San Joaquin Municipal Utility District and its directors, as well as various Doe districts and Doe directors. Service of process in this case was not made or attempted upon Krug, Straus, Boke or Blote, or any of the Doe defendants, but was made upon Rodner,

Durant, the Madera Irrigation District and the South San Joaquin Municipal Utility District, all in the State of California.

The United States Attorney filed motions to dismiss on behalf of the above named persons who are officials of the Bureau of Reclamation. The Madera Irrigation District, on stipulation of the plaintiffs and the consent of the court, filed an oral motion to dismiss on March 9, 1950. The South San Joaquin Municipal Utility District, after submission, filed motions to dismiss on the identical grounds designated by the United States Attorney, and, without objection by plaintiff, they are submitted on the record made at time of submission of the other motions.

The plaintiffs orally joined in a motion for preliminary injunction which had been made in related cases and set and noticed for March 8, 1950, along with said motion to dismiss in this and related cases before the three-judge court which dissolved as above stated, and the matters proceeded before this single judge beginning March 9, 1950.[2] The motions to dismiss were submitted on the briefs and the previous arguments. The motions for interlocutory injunction were argued and submitted on the briefs, arguments, files, records, and evidence taken at the hearing.

Before considering the motions for interlocutory injunction in either this or the related cases, it is necessary to consider and dispose of the matters raised by the motion to dismiss in this case for the reason that, whether or not a cause of action is or can be stated, will, or may, affect the result of the motions for injunction; but more importantly for the reason that the motion to dismiss postures the basic issues raised, the determination of which will affect all of the pending cases and the whole course of the litigation.

1. The ruling was as follows: "In our view the complaints in these actions, as now amended, present no substantial question of the constitutional validity of any of the Acts of Congress referred to in the amended complaints. There is, therefore, no question before the court which requires submission to a three-judge court; and the three-judge court is dissolved."

2. Boke and Blote were served in Case No. 681-ND and the motion to dismiss filed on their behalf in that case was consolidated for hearing with the motion in this case. The lack of service on Boke and Blote in this case does not alter the conclusions herein.

The motion to dismiss is made on the following grounds:

1. The complaint fails to state a claim upon which relief can be granted;

2. This is in fact a suit against the United States; the United States is an indispensable party and has not consented to be sued;

3. The Secretary of the Interior is an indispensable party, and this court cannot obtain jurisdiction over him; and

4. Plaintiffs have a plain, speedy and adequate remedy at law.

In considering the motions to dismiss, it is axiomatic that well-pleaded and material allegations of the complaint must be taken to be true, as well as matters which may be judicially noticed, which include public facts, geographical positions, reports to Congress, proceedings thereon, public activities within the common experience of men, and the like. And the judge may resort to any means the judge deems safe to refresh his memory. Greeson v. Imperial Irrigation District, 9 Cir., 1932, 59 F.2d 529; Nev-Cal Electric Securities Co. v. Imperial Irrigation District, 9 Cir., 1936, 85 F.2d 886. And upon a motion to dismiss under the Federal Rules of Civil Procedure, 28 U.S.C.A., the complaint should be construed in the light most favorable to the plaintiff with all doubts resolved in plaintiffs favor. Cool v. International Shoe Co., 8 Cir., 1944, 142 F.2d 318.

I turn then to the allegations of the complaint as amended, which will be stated more or less in substance, and to the matters judicially noticed which will be indicated throughout this memorandum as they arise.

It is alleged that: each of the twelve plaintiffs is an owner of a separate parcel or parcels of farm land, a description of each of which is attached to the complaint as part of its Exhibit "A". They sue for themselves and all members of the same class consisting of approximately 125 other owners of farms totaling approximately 47,500 acres of land which lie along or are otherwise riparian to the San Joaquin River *below* Friant Dam and *above* Mendota Dam, and of approximately 1000 other ranchers owning approximately 600,000 acres of land likewise situated between Friant and Mendota Dams, all of which overlay underground waters, and have similar rights to those of plaintiffs, and to each other, and will suffer similar damage or taking by the acts of the defendants; that they are the owners and each of said members of said class is the owner of riparian, prescriptive and appropriative rights to the waters of said river; that all of said lands have, from time immemorial, overlaid and contained underground and percolating waters, water stratas and subterranean streams which are, and at all times prior to the acts of the defendants were, and have been, fed, supplied, sustained, supported and replenished by the waters of the San Joaquin River as it flowed, seeped and percolated; that none of the plaintiffs have consented to a taking of their water rights or land, and that none of the members of the class have consented to such taking;[3] "that plaintiffs are now engaged, and plaintiffs and their predecessors in title and interest in said lands described in Exhibit 'A' have continuously been engaged for more than 60 years last past

3. After the transfer of the Rank case, 685-ND to this court, on October 6, 1947, each of the individual plaintiff landowners in the Rank case, (685-ND) filed a separate suit against the United States for damages, each under the sum of $10,000, under the Tucker Act [See 1948 Revised Judicial Code, 28 U.S.C.A. §§ 1346, 1402, 1491 et seq.]. The cases are numbered 670–671–672–673–674–675–676–677–678–679 and 682, all Northern Division. Motions to dismiss all of them were filed by the United States Attorney but by consent of all parties that motion will be held in abeyance until disposition of the instant motions to dismiss. Accordingly, this court is herewith concurrently making a minute order putting them off calendar until further order of the court. And they will not be considered herein except in connection with the contention of the defendants that plaintiffs have made an election, and that for that reason the instant equity suit must abate as to them.

and long before any of the dams, diversions, works and other structures of plaintiffs hereinafter mentioned were either begun, started or conceived of, in reasonably and beneficially using all of said waters of said San Joaquin River by means of reasonable methods of use and by means of reasonable methods of diversion for domestic, poultry, cattle and animal drinking water, and in farming all of said lands of plaintiffs more particularly described in Exhibit 'A' (with the exception of a small amount of timber and brush land which plaintiffs are shortly intending to cut down and turn into irrigated pasture and crop lands) to crops of grapes, peaches, plums and other fruits, cotton, alfalfa, grain, corn, melons, potatoes, vegetables and to natural and irrigated pasturage (upon which pasturage plaintiffs and their predecessors in interest and title have, during all times herein mentioned, raised cattle, horses, sheep, hogs and poultry, and some of which said natural pasturage plaintiffs, within a reasonable time, intend to and will plant to irrigated pastuarge and crops), by means of pumping the waters of said San Joaquin River out of the channel and natural bed of said San Joaquin River and distributing said water through concrete pipelines, conduits, canals and ditches to and depositing said water upon said lands of plaintiffs set forth and described in said Exhibit 'A' * * * and by means of pumping from said underground and percolating waters and said waters of said subterranean streams and water stratas underlying said lands of plaintiffs more particularly described in said Exhibit 'A' * * * (all of which said underground and percolating waters, water stratas and said subterranean streams are fed by, sustained by, supplied by, supported by, flow and percolate from and are fed by and replenished by said waters of said San Joaquin River, as aforesaid), from wells located upon said lands of plaintiffs, described in Exhibit 'A' * * * and distributing said pumped waters and depositing the same through concrete pipelines, conduits, canals and ditches upon said lands of plaintiffs, set forth and described in Exhibit 'A' * * * and by means of subirrigation, capillary attraction, percolation and like natural forces operating between said underground and percolating waters and subterranean streams and water stratas underlying said lands of plaintiffs and the roots of the trees, vines, grasses and crops so grown on said lands of plaintiffs. That all of said pumps, wells, ditches, concrete pipelines and conduits in this said paragraph referred to were and are constructed and maintained in accordance with recognized and generally accepted engineering standards and practices, and all of said waters of said San Joaquin River so deposited or used upon, under or in said lands of plaintiffs and in the subirrigation of said lands of plaintiffs were and are so deposited and used upon, under and in said lands of plaintiffs described in Exhibit 'A' * * * in accordance with the best recognized and accepted agricultural standards and practices, both as to time of, amounts of and methods of use of said waters. That all of the waters of said San Joaquin River are and will be needed by plaintiffs for the purposes hereinabove and in this paragraph set forth and for replenishing, sustaining, feeding, supplying and supporting, and for seeping into, percolating and flowing into said underground and percolating water, water stratas and said subterranean streams and said subirrigation of said lands."

It is also alleged that by reason of the flow of said river past the lands of plaintiffs and said class, they and the public have used and have a right to use said flow for fishing and recreation, and that said river has a salmon run of approximately 200,000 which is a major Pacific Coast salmon run and contains and is the habitat of large runs of bass, trout, catfish, shad and other edible fish which swim in, spawn upon, and are harvested in the said river where it flows in, over or along the lands of the plaintiffs and their class, which has resulted in a large commercial, sport and recreational industry dependent upon fish; that the lands of the plaintiff which lie immediately adjacent to the natural channel of the river contain valuable deposits of rock, sand and gravel which are harvested for commercial purposes, and that the supply thereof is replenished from

year to year by the river in its natural flow.

That by reason of all of the foregoing rights and uses the "plaintiffs are the owners of, need, and are entitled to the use of all of the flow of the waters of the San Joaquin River flowing past, through or over said lands of plaintiffs * * * and are the owners of, need and are entitled to the use of all of said underground and percolating waters, water stratas and said waters of said subterranean streams underlying and in said * * * lands * * * for said present uses * * * and which may and will be required for reasonably prospective recognized uses on said lands of plaintiffs."

It is then alleged that the defendants purporting to act in their official capacities have built Friant Dam about eight miles upstream from plaintiffs' lands and are building diversion works, and have diverted and are threatening to and will, unless restrained, impound and divert the *entire flow* of the San Joaquin River at Friant Dam so that the flow below the dam will disappear, which will ultimately destroy plaintiffs' land for any agricultural purpose, deprive them of their domestic drinking water supply and for their livestock, and render plaintiffs' land unfit for habitation, as well as take and destroy the water rights of plaintiffs and their class for commercial or public or private recreational purposes and for the annual run and as a habitat of salmon and other fish, and as a further result, that the sand and gravel pits will not be replenished and will be taken and become valueless. It is also alleged that the defendants have executed a contract with the Madera Irrigation District and the South San Joaquin Municipal Utility District, and have and are threatening to execute other contracts to divert the entire flow of the river at Friant which are unlawful for various reasons, one of which is asserted to be that the water is to be used for other than a public use in that the water proposed to be diverted to the South San Joaquin Municipal Utility District and other areas is to be put to the identical uses to which it is now put by the plaintiffs, but on lands privately owned by others and in another watershed than that of the San Joaquin River.

Plaintiffs' assertions of rights to the flow of the river thus fall into four categories, viz.: (1) the right of use for agricultural and personal domestic purposes, whether directly from the river or for replenishment of underground streams, stratas and supplies; (2) the right of use for personal and public recreational purposes, such as boating and recreational fishing and the like; (3) the right of use for replenishment of sand and gravel pits; and (4) the right of use for spawning and fishing of salmon and other fish for both general commercial purposes and the general recreational purposes of the public.

It is alleged that ever since the commencement of the project in 1935, the defendants who are officials, and their predecessors, have repeatedly informed and assured plaintiffs that their water rights would not be taken or disturbed by either the building and operation of the dam or diversionary works; that plaintiffs and the members of said class in reliance upon said statements, and as a result of deceptive, coercive and threatening statements, had taken no action until they were informed for the first time on July 15, 1947, to the effect, that unless they accepted an offer by the Bureau of Reclamation for the "adjustment" of their water rights on the terms fixed by the Bureau, or filed suit for damages before October 20, 1947, their water rights would be taken without compensation. The letter was signed by the defendant Boke, "Reginal Director." The plaintiffs allege that on July 28, 1947, they consulted counsel, which resulted in the filing of the instant suit on September 25, 1947.

■ It is alleged in the complaint and it is judicially noticed that the San Joaquin River is a natural water course; it, together with its tributaries, arises and flows wholly within the state of California; it flows into Suisun Bay, at a point below Stockton and ultimately empties into the Pacific Ocean through San Francisco Bay; the Sacramento River and its tributaries

likewise arise and entirely flow within the state of California; the portion coursed by the Sacramento River has long been known as the Sacramento Valley and the portion coursed by the San Joaquin River has long been known as the San Joaquin Valley; together they have been called the Sacramento-San Joaquin Valley, until, in recent years, it has been known as the Central Valley; the San Joaquin in its natural state had well-defined channels and banks, and passed from the Sierra Nevadas in eastern California, where it arises, on to the valley plain at a place called Friant; it flowed westerly about forty miles to a place called Mendota, and thence, turning, flowed northerly, ultimately emptying into the Pacific Ocean through San Francisco Bay; throughout its course its waters have been the source of hydroelectric power, domestic and agricultural uses, either by direct diversion from the river or by supplying underground, percolating and stored waters for natural subirrigation or surface irrigation and domestic uses from wells. Such underground and percolating waters, water stratas and subterranean streams are alleged to extend approximately 15 miles southerly and 5 miles northerly from the bed of the river as it flowed between Friant and Mendota, which is the area wherein the lands of the plaintiffs lie and which is the area particularly concerned in this, the Rank case, No. 685-ND. That area is of the most highly developed and fertile agricultural character due to the use of the waters of the San Joaquin River, either surface flowing water or underground water; within it lie valuable vineyards, orchards and lands developed to specialized produce for human consumption as well as cotton, alfalfa and grain lands, and extensive dairy herds; not the least of the uses to which the water is put is for domestic purposes, as, for instance, the city of Fresno is within the 15 mile area south of and in the watershed of the river, and is dependent for its municipal water supply upon wells.

■ The court can take judicial notice of the fact that the San Joaquin River is not one that is equated by nature through the year, but is seasonal in its flow; a flood stage in the spring with rains and melting snows, and a low flow between seasons arising in part by the intense evaporation from heat (120 degrees in the late summer) and also by the diversions and uses to which "men of experience and means, energetic, enterprising and resourceful" have put them. Katz v. Walkinshaw, 1903, 141 Cal. 116, at page 127, 70 P. 663, 74 P. 766, 769, 64 L.R.A. 236, 99 Am.St.Rep. 35.

■ While the prayer is no part of the plaintiffs' cause of action, Nester v. Western Union Tel. Co., D.C.S.D.Cal.1938, 25 F.Supp. 478, and a complaint will not be dismissed merely because a plaintiff has demanded relief to which he is not entitled, Commonwealth Trust Co. of Pittsburgh v. Reconstruction Finance Co., D.C.W.D.Pa. 1939, 28 F.Supp. 586, and a court must grant relief to which a plaintiff is entitled even if such relief has not been demanded in the pleadings, F.R.C.P. 54(c), it is well to look at the prayer of plaintiffs' complaint, if for no other reason than to point up the contentions of the parties, and the issues raised on the motions to dismiss. It asks judgment: (1) that defendants be enjoined from impounding and storing and from making seasonal or cyclical storage of the water of the river back of Friant Dam; (2) that defendants be enjoined from diverting, transporting, selling or contracting to sell said waters for use outside the watershed of the San Joaquin River; (3) in the alternative that the court make a "physical solution" as that term is used and understood in the laws and by the courts of the State of California; (4) in the alternative that the court make a judgment of "inverse" or "reverse" condemnation as that term is used and understood by the courts of the State of California; (5) that all contracts purporting to sell or carry away water in violation of plaintiffs' rights (only two are alleged, viz.: Madera and South San Joaquin) be declared null and void and that the defendants be restrained from entering into any further or other such contracts pending the determination of this case; (6) and for such other and further relief as may seem meet and equitable in the premises.

The defendants set forth four different grounds in their motions to dismiss, but a determination of the points made under the first ground, i. e., that the complaint does not state a cause of action, will either clarify or dispose of the other grounds. That ground will, therefore, be considered first, and as well, for the reason that it reaches the basic contentions upon which the parties have come to grips so seriously and so vigorously.

These contentions pose the issues as to (1) whether or not the plaintiffs have *any* water rights; (2) if so, what those water rights are, and against whom they exist; (3) whether or not *any Act of Congress* has taken or authorized such rights, if any, to be taken; (4) whether or not the defendants have taken or have been and are threatening to take such rights, if any exist; (5) whether or not the plaintiffs have a plain, speedy and adequate remedy at law.

Do the plaintiffs have any water rights? To anyone with the slightest acquaintance with the history of the arid west and its conversion from barren wastes, first to the uses of mining, as illustrated in the history of the gold and silver mines in California, then to the development of some of the richest and most highly productive agricultural land known, as illustrated by the lands of the plaintiffs and numerous other conversions from barren desert to highly productive and valuable land, and then to domestic and power uses supporting enormous populations and industries as in the Los Angeles and San Francisco areas, by the use and development of streams and rivers, both seasonal and regular, and the development and use of the underground waters, whether flowing, stored or percolating, no compendium of legal citation is needed to demonstrate that beyond peradventure of doubt the plaintiffs in this case and the members of their class with their land lying as it is and using the waters of the river as they have been and are, have valuable water rights in and to the use of the waters of the San Joaquin River which are part and parcel of the land, which if taken or destroyed will result in the complete destruction of the value of their land for agricultural purposes, as well as for domestic uses, and if either taken or diminished will result in loss and damage. A few references will suffice: Eddy v. Simpson, 1853, 3 Cal. 249, 58 Am.Dec. 408; Irwin v. Phillips, 1855, 5 Cal. 140, 63 Am. Dec. 113; Katz v. Walkinshaw, 1902–1903, 141 Cal. 116, 70 P. 663, 74 P. 766, 64 L.R. A. 236, 99 Am.St. Rep. 35; Lux v. Haggin, 1886, 69 Cal. 255, 4 P. 919, 10 P. 674; Burr v. Maclay Rancho Water Co., 1908, 154 Cal. 428, 98 P. 260; Miller v. Bay Cities Water Co., 1910, 157 Cal. 256, 107 P. 115, 27 L.R.A.,N.S., 772; Herminghaus v. Southern California Edison Co., 1926, 200 Cal. 81, 252 P. 607; Peabody v. City of Vallejo, 1935, 2 Cal.2d 351, 40 P.2d 486 and cases there cited; Rancho Santa Margarita v. Vail, 1938, 11 Cal.2d 501, 81 P.2d 533; Atchison v. Peterson, 1874, 20 Wall 507, 22 L.Ed. 414; Jennison v. Kirk, 1878, 98 U.S. 453, 25 L.Ed. 240; Broder v. Natoma Water & Mining Company, 1879, 101 U.S. 274, 25 L.Ed. 790; State of Nebraska v. State of Wyoming, 1935, 295 U.S. 40, 55 S.Ct. 568, 79 L.Ed. 1289; California-Oregon Power Co. v. Beaver Portland Cement Co., etc., 1935, 295 U.S. 142, 55 S. Ct. 725, 79 L.Ed. 1356; Ickes v. Fox, 1937, 300 U.S. 82, 57 S.Ct. 412, 81 L.Ed. 525; State of Nebraska v. State of Wyoming, 1945, 325 U.S. 589, 65 S.Ct. 1332, 89 L.Ed. 1815; State of Wyoming v. State of Colorado, 1922, 259 U.S. 419, 42 S.Ct. 552, 66 L.Ed. 999; State of Kansas v. State of Colorado, 1907, 206 U.S. 46, 27 S.Ct. 655, 51 L.Ed. 956; State of Colorado v. State of Kansas, 1943, 320 U.S. 383, 64 S.Ct. 176, 88 L.Ed. 116; U. S. v. Humboldt, etc., Co., 9 Cir., 1938, 97 F.2d 38, certiorari denied 305 U.S. 630, 59 S.Ct. 94, 83 L.Ed. 404; U. S. v. Central Stockholders', etc., 9 Cir., 1931, 52 F.2d 322; California Constitution, Art. XIV, and the entire Water Code of California; Act of July 26, 1866, 14 Stat. 251, at page 253, Sec. 9, 43 U.S.C.A. § 661; Act of July 9, 1870, 16 Stat. 217, at page 218, Sec. 17, 43 U.S.C.A. § 661; The Basic Reclamation Act of 1902, 32 Stat. 388, as amended from time to time, 43 U.S.C.A. § 372 et seq.; Act of June 25, 1910, 36 Stat. 835, Sec. 4, 43 U.S.C.A. §§ 400, 413; Act of Dec. 5, 1924, 43 Stat. 672, at page 702, Sec. 4, Sub. B, 43 U.S.C.A. § 412;

Act of August 26, 1937, 50 Stat. 850, Sec. 2; Flood Control Act of December 22, 1944, 58 Stat. 887 et seq.

What rights· do the plaintiffs have, and against whom do they exist? The resolution of this question also involves a determination of whether or· not any Act of Congress has taken or authorized such rights to be taken, and whether or not the defendants have taken or are threatening to take such rights.

From the cases and statutes just cited it is clear that the Supreme Court and Congress have been consistent in leaving the question of property in water rights to be determined. by and under local state law except in so far as Congress may exercise its constitutional power to regulate navigable waters, or for flood control under the Commerce Clause, article 1, § 8, cl. 3. In cases where such power was exercised, where the damage has been substantial so that there was a taking, the Supreme Court has been consistent in holding that such taking was compensable under the 5th Amendment. Where no right to compensation has been allowed, it has usually been on the holding that the right taken was not property, and that damages were merely incidental, uncertain, remote, conjectural, prospective, speculative, or not a direct result of the Government's action.

Some cases, but by no means all, illustrative of a taking where the powers were exercised under the Commerce Clause, are: Kohl v. U. S., 1875, 91 U.S. 367, 23 L. Ed. 449; U. S. v. Lynah, 1903; 188 U.S. 445, 23 S.Ct. 349, 47 L.Ed. 539; Pumpelly v. Green Bay, etc. Co., 1872, 13 Wall. 166, 20 L.Ed. 557;· Williams v. U. S., C.C. 1903, 104 F. 50 affirmed 188 U.S. 485, ·23 S.Ct. 363, 47 L.Ed. 554; U. S. v. Cress, 1917, 243 U.S. 316, ·37 S.Ct. 380, 61 L.Ed. 746; U. S. v. Dickinson, 1947, 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789;· U. S. v. Chandler-Dunbar· Water Power Co., 1913, 229 U.S. 53, 33 S.Ct. 667, 57 L.Ed. .1063 (where the installed improvements were held compensable); Ford & Son v. ·Little Falls Fibre Co., 1930, 280 U.S. 369, 50 S.Ct. 140, 74 L.Ed. 483. In U. S. v. Causby, 1945, 328 U.S. 256, 66 S.Ct. 1062, 1068, 90 L.Ed. 1206, the Supreme Court had under consideration the power to regulate flights of airplanes under the Air Commerce Act of 1926, 44 Stat. 568, 49 U.S.C.A. § 171 et seq., as amended by the Civil Aeronautics Act of 1938, 52 Stat. 973, 49 U.S.C.A. § 401 et seq., which Act finds its constitutional vitality in the Commerce Clause. The court held that the owner of a chicken farm had a right to compensation for the loss in value of his land because the prescribed height of flights scared his chickens to death. It there affirmed the doctrine that while the meaning of property as used in the 5th Amendment was a federal question, "it will normally obtain its content by reference to local law." The court quoted with approval the statement from U. S. v. Cress, supra, that " * * * it is the character of the invasion, not the amount of damage resulting from it, so long as the damage is substantial, that determines the question whether it is a taking." [243 U.S. 316, 37 S. Ct. 385.] The right to devote land to chicken farming can be no greater than the water rights involved here. In Kimball Laundry v. U. S., 1949, 338 U.S. 1, 69 S.Ct. 1434, 7 A.L.R.2d 1280, the Supreme Court in a condemnation under the Second War Powers Act of March 27, 1942, 56 Stat. 176, 50 U.S.C.A.Appendix, § 632, of a laundry, held that the trade routes or customers list were compensable under the 5th Amendment. The property right of a customers list against the war power can be no greater than the property right in the use of water against the commerce power. Cases illustrative of the holding that there was not a taking of property (and by no means all of them) are: Bedford v. U. S., 1904, 192 U.S. 217, 24 S.Ct. 238, 48 L.Ed. 414; Jackson v. U. S., 1930, 230 U.S. 1, 33 S.Ct. 1011, 57 L.Ed. 1363; Hughes v. U. S., 1913, 230 U.S. 24, 33 S.Ct. 1019, 57 L.Ed. 1374, 46 L.R.A.,N.S., 624; Willink v. U. S., 1916, 240 U.S. 572, 36 S.Ct. 422, 60 L.Ed. 808; U. S. v. Chicago, M. St. P. & P. R. Co., 1940, 312 U.S. 592, 313 U.S. 543, 61 S.Ct. 772, 85 L.Ed. 1064; Gibson v. U. S., 1867, 166 U.S. 269, 17 S.Ct. 578, 41 L.Ed. 996; Scranton v. Wheeler, 1900, 179 U.S. 141, 21 S.Ct. 48, 45 L.Ed. 126; U. S. v.

Commodore Park, Inc., 1945, 324 U.S. 386, 65 S.Ct. 803, 89 L.Ed. 1017; U. S. v. Willow River, etc., 1945, 324 U.S. 499, 65 S.Ct. 761, 89 L.Ed. 1101, and annotation following 89 L.Ed. 1101, at page 1114, et seq.

 Considering first the plaintiffs' contention that they are entitled to the flow of the river for agricultural and domestic uses. Water rights in California are both riparian and appropriative, and prescriptive.[4] Such water rights are "usufructuary, and consist not so much of the fluid itself as the advantage of its uses," and have been so regarded since the earliest day. Eddy v. Simpson, supra, as to the flow in visible streams; Katz v. Walkinshaw, supra, as to underground waters. Rights to the use of underground waters, whether flowing, stored or percolating, by the overlaying owner or appropriator are analogous and equal to riparian rights, against subsequent claimants, and are part and parcel of the land, and as such are real property. Hill v. Newman, 1855, 5 Cal. 445, 63 Am. Dec. 140; South Tule Independent Ditch Co. v. King, 1904, 144 Cal. 450, 77 P. 1032; Katz v. Walkinshaw, supra; Lux v. Haggin, supra; Miller v. Bay Cities Water Co., 1910, 157 Cal. 256, 107 P. 115, 27 L.R.A.,N.S., 772; Herminghaus v. Southern California Edison Co., 1926, 200 Cal. 81, 252 P. 607; Peabody v. City of Vallejo, supra; Tulare Irr. Dist. v. Lindsay-Strathmore etc., 1935, 3 Cal.2d 489, 45 P.2d 972; Rancho Santa Margarita v. Vail, 1938, 11 Cal.2d 501, 557, 81 P.2d 533; Meridian, Ltd., v. City and County of San Francisco, 1939, 13 Cal.2d 424, 90 P.2d 537, 91 P.2d 105; U. S. v. Central Stockholders' Corp., 9 Cir., 1931, 52 F.2d 322, 327; Calif. Civil Code, Sec. 658. Prior to the addition of Sec. 3 to Article XIV of the California Constitution by amendment in 1928 (Appendix B), the owners of riparian or overlaying land were entitled to the full flow of the river. Miller and Lux v. Madera Canal & Irrigation Co., 1909, 155 Cal. 59, 99 P. 502, 22 L. R.A.,N.S., 391 Herminghaus v. Southern

California Edison Co., supra and cases there reviewed. That amendment, in effect, enlarged the previous constitutional provision of 1879, Sec. 1, Art. XIV, California Constitution that the "sale, rental, or distribution" of water in the State of California was a public use and in effect said that the *use* of all water in the State of California was a public use. It did not change the law relating to acquisition or ownership of water rights, but superimposed on those rights the requirement that all water must be put to a reasonable and beneficial use and none may be wasted.

 The effect of the 1928 Amendment to the California Constitution has been considered several times by the Supreme Court of California. Peabody v. City of Vallejo, 1935, supra; City of Lodi v. East Bay, etc., 1936, 7 Cal.2d 316, 60 P.2d 439; Tulare Irrigation District v. Lindsay-Strathmore etc., 1935, 3 Cal.2d 489, 45 P.2d 972; Hillside Water Co. v. City of Los Angeles, 1938, 10 Cal.2d 677, 76 P.2d 681; Meridian, Limited, v. City and County of San Francisco, 1939, 13 Cal.2d 424, 90 P.2d 537, 91 P.2d 105; and Wright v. Best, 1942, 19 Cal.2d 368, 121 P.2d 702. In each of them the riparian, prescriptive and appropriative rights theretofore recognized were affirmed and held to be on an equal footing with each other against subsequent claimants, and part and parcel of the land, and paramount to subsequent appropriators or users, and entitled to protection by injunction in equity, subject only to the requirement that the water be put to reasonable and beneficial uses.

 It was stated in Meridian, Limited, v. City and County of San Francisco, supra, 13 Cal.2d page 445, 90 P.2d page 547: "* * * it was established that by the changes in the law the right to use the waters of rivers and streams of the state has been limited to a reasonable and beneficial use; that the riparian owner has a prior and paramount right to this use and if necessary is entitled to the full natural

4. See article "Waters," 25 and 26 Cal. Jur. From the present state of the case no question arises as to how far the power of the Federal Government

may be exercised in connection with its ownership of riparian land. See, U. S. v. Central Stockholders' Corporation, 9 Cir., 1931, 52 F.2d 322–326.

flow of the stream or its equivalent undiminished in quantity and unimpaired in quality. The riparian owner is safeguarded in this right by the constitutional amendment. But the amendment also provides that 'riparian rights in a stream or water course attach to, but to no more than so much of the flow thereof as may be required or used consistently with this section * * *'. This provision clearly means that when the law has guaranteed to the riparian owner the use of the waters of the stream to the full extent to which he may put the same for all present and prospective useful and beneficial purposes, and has made available to him the means of protecting the rights so guaranteed, he has received the full measure of benefit and protection to which he is entitled, and can claim no more." In Tulare Irrigation District v. Lindsay-Strathmore, etc., supra, 3 Cal.2d at page 525, 45 P.2d at page 986, it was said: "The new doctrine not only protects the actual reasonable beneficial uses of the riparian, but also the prospective reasonable beneficial uses of the riparian." And it was held that pending the time the riparian needed the water for such prospective beneficial uses, an appropriator could use it until demand was made by the previous riparian owner. The court, in Meridian, Limited, v. City and County of San Francisco, supra, quoted with approval the statement in Peabody v. City of Vallejo, supra, 2 Cal.2d page 375, 40 P.2d page 495, as follows: "The problem in any case is to ascertain what portion of the product of the stream is subject to appropriation after all reasonable beneficial uses on the part of those having paramount rights have been enjoyed or safeguarded."

In 1943 the State of California, in a revision and codification of its laws, enacted the Water Code. In addition to implementing the Constitutional Amendment of 1928, it also provided, in Sec. 103, that "In the enactment of this code the Legislature does not intend thereby to effect any change in the law relating to water rights." Section 101 specifically preserved all riparian and appropriative rights to the owners of land for reasonable and beneficial uses. It

also provided that the use of water for domestic purposes is the highest use of water and the next highest use is for irrigation. Sec. 106.

The plaintiffs claim in their complaint that they and their class have put the entire flow of the river to "reasonable and beneficial uses" and are entitled to have, and that it is necessary for those reasonable and beneficial uses, present and prospective, to have the entire flow of the San Joaquin River continued without any impoundment or diversion at Friant Dam. On the original argument, and subsequent arguments and hearings the plaintiffs have asserted by statement of counsel that, while they are entitled to have, they do not want all the water to continue to flow past their lands in its natural state, and that what they seek is only to have the amount of water released from Friant Dam which will not either damage or destroy their land by taking away their natural surface and underground waters, or as plaintiffs' counsel put it: they want a "reasonable supply of water." It does not appear from the complaint and no contention is made by defendants that the impounded waters at Friant are being, or will be used for domestic purposes by any impoundment or diversion. Therefore, it is not, under the Water Code of California, a higher use than that to which the plaintiffs put it.

It must be said from the allegations of the complaint, which must be accepted as true, that the plaintiff and the members of their class have been and are presently and prospectively putting all of the flow of the river heretofore available to them to reasonable and beneficial uses and to the highest and best use. Whether or not it is such a reasonable and beneficial use, to the fullest extent to which the waters are capable so that there is no waste under the California Constitution and laws, is not before this court on the motion to dismiss. In summary, the rights of the plaintiffs to the use of the waters of the San Joaquin River may be said to be that amount of its flow as has been and is reasonably and beneficially used presently and prospectively under reasonable methods of use and diversion.

It is admitted by defendants' counsel that such rights exist as against others of similar right, but *it is contended that under no circumstances do the plaintiffs have any water rights against the impounding and diversion of the entire flow of the San Joaquin River if such is done by the United States for the "improvement of navigation" or flood control, and that the Friant Dam and diversionary works are erected for the "improvement" of navigation and flood control.*

In short, the position of counsel for defendants in this court is this: that the San Joaquin River is navigable in part (it is navigable to Stockton (150 miles below Mendota) as a matter of judicial notice, and has been navigable to Hills Ferry (80 miles below Mendota), according to reports of Army engineers, but has never been navigable as far as Mendota, much less along the strip between Mendota and Friant); and that being so, *no one can have any rights* as against any action of the United States in building obstructions in the San Joaquin River, or the defendants in diverting *its entire flow* if Congress has declared that the appropriation for the building of such obstruction (dams) or diversionary works (canals) are for the improvement of navigation or flood control, regardless of the fact that Congress has also said in the same statute that such works were for irrigation and other purposes and regardless of the fact that Congress required all such works to be done under the requirement of the Reclamation laws and that such work has been done under the Reclamation laws.

Or, stated another way, the defendants' position is this: The San Joaquin River is navigable in part in its lower reaches; the Sacramento River is likewise navigable in part in its lower reaches; both rivers are within the state so far as their basins are concerned and their drainage; there have been floods in the past on the lower San Joaquin River, and, inasmuch as both rivers are navigable in part and there has been flood damage at times, and Congress has, and has exercised, plenary power over them and the flow of their waters, in lumping them together for appropriation purposes, the *entire flow* of the San Joaquin River, or any of its tributaries may be diverted and *taken in total disregard of all rights and all uses, without compensation, below such point of diversion.* This is true, say Government counsel, because under the Commerce Clause the control of Congress is complete and plenary over navigable rivers and their tributaries.

Defendants' counsel conceded that under their theory the owners of "fast" lands must have their property condemned or be compensated in damages. They define "fast land" in this instance as land above the ordinary high water mark of the San Joaquin River, above Friant Dam. Putting it another way, they say that the owners of land *above* Friant, whose lands and rights to their use are destroyed by flooding as a result of the *impounding* of water are entitled to be compensated even though the impounding is in aid of navigation or flood control; but that those whose lands are *below* the dam and whose land is destroyed for any useful purpose as a result of the total *taking and diversion* of water, are not entitled to compensation because the dam was built as a part of a scheme to aid navigation or to control floods. There is a vast difference between impounding water and merely delaying or regulating the flow in aid of navigation or flood control or power purposes where it re-enters the river system below the point of impoundment, and the situation complained of here, where it is asserted that after the impoundment at Friant, the entire flow of the river is threatened to be diverted so that it does not again re-enter the river system of the San Joaquin, and will as effectively and completely destroy the farms and lands of the plaintiffs and their usefulness as if they were permanently flooded. To concede that a person is entitled to compensation whose land is above the dam and is destroyed by flooding, but to deny compensation for those whose land is below, and is dried up completely, and made useless and thus destroyed by the same dam, makes it difficult to follow the logic of the defendants.

But, in view of the importance of the matter, their contentions make it necessary to examine the various Acts of Congress

(Appendix A) dealing with the Central Valley Project and appropriations therefor, as well as the *Reports to Congress* at the time of the passage of those statutes.

Both the State of California and the United States have, for a very long time, been engaged in investigation and planning for the maximum use of the waters in the streams of the Central Valley. The Central Valley Project as a whole had its inception with the enactment by the State of California, upon vote of the people, of the Central Valley Project Act of 1933, Cal. Stats.1933, p. 2643, now, California Water Code, Secs. 11100 to 11855. The Act called for the construction of various works, including a dam at Friant, to be constructed by the State with federal aid. The State was not successful, however, in obtaining a grant from the Federal Public Works Administration, and in May, 1935, the Bureau of Reclamation applied for an allotment for a federal project under the Emergency Relief Appropriation Act of April 8, 1935 (Appendix A-8), which was made in September, 1935. Meanwhile Congress passed the Act of August 30, 1935 (App. A-9) authorizing certain work not involved here and not including a dam

at Friant,[5] to be done under the direction of the Secretary of War by the Chief of Army Engineers. Also in the meanwhile the Supreme Court, on April 29, 1935, had decided U. S. v. State of Arizona, 1935, 295 U.S. 174, 55 S.Ct. 666, 79 L.Ed. 1371, which held that Parker Dam on the Colorado River then being constructed under an allotment by the Federal Emergency Relief Administration to the Reclamation Bureau, was not authorized by Congress, because there had been no compliance with Section 4 of the Act of June 25, 1910 (App. A-4) requiring a feasibility report and the approval of President. That section requires that for any money to be spent which is put to the credit of the reclamation fund, there must be a report recommending it to the President, and the President's approval filed with Congress. Thus, on November 26, 1935, pursuant to Sec. 4 of said Act of June 25, 1910, and said Amendatory Act of December 5, 1924, (App. A-5), the then Secretary of the Interior made such a report (referred to by the parties and hereinafter as the feasibility report), which the President approved and sent to Congress. Because of its importance in the instant matter it is set forth in full as Appendix

---

5. This was the first Act of Congress after the California Central Valley Act of 1933 making mention of works to be installed on the San Joaquin River. It made appropriations to the Secretary of War for work to be done under the Corps of Engineers, according to the Report dated June 10, 1933, Rivers and Harbors Committee, Doc. 35, 73rd Congress, Rivers and Harbors Committee, Doc. No. 50, 72nd Congress, and Rivers and Harbors Committee, Doc. No. 48, 72nd Congress. The Report of June 10, 1933, deals with the channel in the San Joaquin River to Stockton. It contains nothing concerning the building of Friant Dam and diversionary works, or from which it can be said that Congress thereby intended that the building of any works above Stockton would be in aid of navigation or flood control or that there was any intention of Congress to take the water rights of the plaintiffs and their class. It is searched in vain to find any mention of work to be done above Stockton or above the lands of the plaintiffs, except that it does say that the region above Stockton is "region

rich in agricultural production, with large exports of grain, fruit, vegetables and other agricultural products, and receipts of lumber, petroleum products and general merchandise." P. 4. Said Document, No. 35, by the letter of the Chief of Engineers, deals almost entirely with improvements in the Sacramento River and the delta region. It condemned any expenditure for canalization for water-borne commerce above Stockton. It does mention the Central Valley Project Act of California of 1933, and mentions a proposed storage dam at Friant, and canals and conduits for distribution of the water "conserved" thereby. It does not recommend the building of the dam at Friant or the appropriation of any money for that purpose. It is significant that the Act in mentioning Report No. 35, makes appropriations only for work on the Sacramento River and its tributaries. Report No. 48 deals entirely with the delta area below Stockton, and no value to such improvements is attributed to Friant Dam.

"C." The first time Congress acted after the feasibility report was on June 22, 1936, when, by Act of that date, Congress made an appropriation of six million dollars to the Bureau of Reclamation for the building of Friant Dam.[6] No mention is made in that Act, however, of the feasibility report. On August 9, 1937 (App. A-11), Congress passed the Interior Department Appropriation Bill, making $12,500,000 available to the Bureau of Reclamation for the Central Valley Project. This Act did not mention the feasibility report. The next Act of Congress relating to this matter is regarded by the parties as the most important one. It is the Act of August 26, 1937 (App. A-12). This act was amended on October 17, 1940 (App. A-20) in particulars not involved here.

The Acts of April 8, 1935 (App. A-8) and of August 26, 1937 (App. A-12) seem to have been regarded by Congress as the Acts which authorize the construction of the project, as evidenced by the fact that, in the Acts of July 30, 1941 (App. A-22) and July 8, 1942 (App. A-24), reference is made to the Central Valley Project as "authorized" by those Acts. While State of Arizona v. State of California, infra, may have cast doubt upon the validity of the appropriations made by said Act of April 8, 1935, because there was no prior feasibility report in accordance with Sec. 4 of said Act of June 25, 1910 and said Act of December 5, 1924, that ground of invalidity was removed by the making of such report on November 26, 1935 (App.C), bringing the project and the appropriations within the Reclamation laws, and more particularly by said Act of August 26, 1937, specifically re-authorizing the project and works, after such report, and making all the works authorized in their construction and operation subject to the Reclamation laws, and by the above mentioned Acts of July 30, 1941 and July 8, 1942.

Turning, then, to the text of the Acts of Congress dealing with Central Val-

ley, there cannot be found therein any language which requires or suggests any intention by any Act of Congress to take the water rights of these plaintiffs and their class without compensation, or to take them at all, for that matter. It would be supererogation to repeat the text of them here. As before stated, they are set forth in Appendix A in the applicable portions. Nor is there anything mentioned in any of the *reports to Congress,* as set forth in the Acts of Congress, or to which the attention of this court has been called, whether mentioned in any Act of Congress or not, which says in language or by inference that the water rights of the plaintiffs and their class between Friant and Mendota are to be taken without compensation, or are to be taken at all. Just the contrary is true, not only as to the Acts of Congress, but as to the reports made to Congress. Nor is there anything in any Act of Congress which specifically mentions Friant Dam and its diversionary works as being in aid of navigation or flood control.

Much is said by counsel for both parties concerning the "Feasibility Report" of November 26, 1935. (App.C.)

The Court of Claims in the Gerlach cases, (Gerlach Livestock Co. v. U. S.), 1948, 76 F.Supp. 87, 111 Ct.Cl. 1, read that report as a declaration that the *"entire flow"* of the San Joaquin River" would be diverted at Friant Dam. But this court cannot so read that report, nor conclude that Congress adopted that view. The portion of the report which apparently gave rise to that conclusion, and to some of the contentions of the plaintiffs here, is as follows: "This water will replace San Joaquin River water now used for irrigation in the Northern San Joaquin Valley, thus permitting the entire flow of the San Joaquin River to be regulated in Friant Reservoir—the second storage unit of the project—and to be utilized in the Southern San Joaquin Valley where local supplies are deficient." It is noted that in the first place, the report does not

---

6. On June 29, 1937, 50 Stat. 352, Congress passed a Joint Resolution making appropriations for relief purposes providing that the money could be spent for flood control and conservation purposes among others. Whether or not any of the money under that Act was made available to the Central Valley Project is not ascertainable from records available to the court.

say that the water will be taken at Friant, but will be regulated; and, in the second place, *any water to be diverted and taken from Friant was to be replaced with "this water,"* which from the immediately preceding portions of the report is clearly meant to be the water intended to be taken into the lower San Joaquin Valley from the Sacramento River but not to any of the lands of plaintiffs and their class. The language is "the supply for the San Joaquin Valley will be conveyed up the San Joaquin River through a series of pumping plants and intervening natural and artificial channels, a distance of 150 miles, lifting the water to an elevation of 160 feet above sea level." The distance of 150 miles referred to is in the vicinity of Mendota, where a dam has been constructed and where the present plans show what is referred to as the Mendota Pool as the southern terminus of the Delta-Mendota canal to be used to bring Sacramento River water to that portion of San Joaquin Valley laying only *below* Mendota, and *not* to any of the lands *above* Mendota, and below Friant, where are located the lands of the plaintiffs and their class. The conclusion may be justified that the report indicated an intention to take all the water below Mendota, and replace it with other water. This court can see no justification for the conclusion that Congress, in making appropriations on the basis of the feasibility report indicated an intention to take the water rights of the plaintiffs' lands above Mendota. This conclusion is further borne out by the statement in the report "that the works of the project will provide an *adequate* water supply for all purposes," and "this project is not designated for bringing new lands into cultivation, but for *maintenance of existing agricultural development* and *existing civilization* of a high type," and "the project will not bring into production new agricultural areas, but will *maintain present values* and civilization." Obviously, if *"existing* agricultural development" and *"present* values" were to be *maintained* by an *"adequate"* water supply, an intention cannot be read into the report to take away the water rights of the plaintiffs and their class whose lands are *below* Friant and

*above* Mendota. Moreover, the report specifically points out that the project is "to be constructed under the Act of June 17, 1902 (The Reclamation Act, App. A–3), and Acts amendatory thereof and supplementary thereto." It was also pointed out that the reason for making the report was the Act of June 25, 1910, and the Act of December 5, 1924, which required such a report on any "irrigation project contemplated" by the Reclamation Act.

By said Act of August 26, 1937 (App. A–12), the entire Central Valley Project was transferred from the Secretary of War to the Secretary of the Interior. This Act is vigorously urged as supporting the position of the defendants that the plaintiffs have no water rights because of the provisions therein that the dams and reservoirs provided in the Central Valley Project (Friant Dam being one) "shall be used, first, for river regulation, *improvement of navigation,* and *flood control;* second, for irrigation and domestic uses; and, third, for power."

The defendants in support of their contentions rely upon the line of cases illustrated by U. S. v. Chandler-Dunbar Water Power Co., 1913, 229 U.S. 53, 33 S.Ct. 667, 57 L.Ed. 1063; U. S. v. Appalachian Electric Power Co., 1940, 311 U.S. 377; 61 S.Ct. 291, 85 L.Ed. 243; and State of Oklahoma ex rel. Phillips v. Guy F. Atkinson Co., 1941, 313 U.S. 508, 61 S.Ct. 1050, 85 L.Ed. 1487. But these cases do not apply here as will hereinafter appear. In each of them there was involved water power development or flood *control,* or both, as distinguished from *diversion and taking* of the water out of its natural course below the dam involved. The construction and works involved in none of them were being done by specific direction of Congress under the Reclamation laws, as is the case here. In all of them the water was *impounded* and *not diverted and taken,* but ultimately found its way, under control, to the lower reaches of the river for its uses there. In no case brought to the attention of the court, or found on research, has there been a complete diversion and taking of the water to the extent or similar to the claimed right of the defendants here.

U. S. v. Chandler-Dunbar Water Power Co., supra, involved condemnation proceedings under a special Act of Congress, which contained no reservation of vested private water rights as is found in Sec. 8 of the Reclamation laws (App. A–3). Even so, in that case the private owner's award for actual taking of and damage to existing improvements was affirmed. Only prospective rights to the future flow of the river, which would have required more structures to be built by the claimant, were held not to be compensable property.

In State of Arizona v. State of California, 1931, 283 U.S. 423, 51 S.Ct. 522, 75 L. Ed. 1154, also relied on by defendants, there was not under consideration the matter of taking any private rights of landowners, but only a police regulation of the State of Arizona relating to the building of dams as against a special Act of Congress authorizing the particular dam in question. The court held that the dam involved had a reasonable relation to the improvement of navigation.

In U. S. v. Appalachian Electric Co., supra, the court had under consideration the question as to whether or not the New River was navigable so as to bring a proposed Power Dam upon which construction had been started under the provisions of the Federal Water Power Act of 1920, 41 Stat. 1063, 49 Stat. 838, 16 U.S.C.A. § 791a et seq. There was no question of taking any water rights which had been put to beneficial use under state laws, nor of any diversion of the waters of the river out of their natural channel below the dam. The court held that, as a matter of fact, the river was navigable and subject to the Federal Water Power Act, thus again reserving as a judicial function the question of navigability in fact. Moreover, as pointed out in Ford & Son v. Little Falls Fibre Co., supra, the Federal Water Power Act contained a provision which required recognition of such private rights, so there was no question of taking water rights, as here.

The defendants rely most heavily upon State of Oklahoma ex rel. Phillips v. Guy F. Atkinson Co., supra. No complaint was made in that case of the loss of use of the water for agricultural purposes downstream after it was impounded. The complaint of Oklahoma was only that power would be sold in Texas which would be the product of the water run through turbines for that purpose. And, specifically, the court in that case pointed out, 313 U.S. on page 534, 61 S.Ct. on page 1064, "There is no complaint that any property owner will not receive just compensation for the land taken." Moreover, in that case the court held that the dam involved did have a reasonable relation to navigation, thus reserving that as a judicial question. The Red River, sixth in length in the United States, draining portions of five states and emptying into the Mississippi in its lower reaches, cannot, in its contribution to the recurring and devastating floods in the lower Mississippi Valley, be compared to the flood control which is, at this state of the record, involved here, where the San Joaquin in the area between Friant and Mendota, has caused damaging floods at the rate of one every 200 years, and in the lower reaches only once in 25 years. H. Doc. 191, 73rd Congress, pages 58–59. For those reasons and others pointed out, the case is not applicable.[7] But in justification of the claims of the defendants as to the extent of their power to take the entire flow of the river, and the lack of any rights in plaintiffs and their class, it is well to further look at that case and its attempted application here. Without repeating in full the arguments made in the briefs of the defendants, their position, with relation to that case, appears to depend up-

---

7. It is interesting to also note that in 1944 the Supreme Court in U. S. v. Willow River Power Co., 1945, 324 U.S. 499, at pages 504–506, 65 S.Ct. 761, 89 L.Ed. 1101 affirmed the doctrine of U. S. v. Cress, 1917, 243 U.S. 316, 37 S.Ct. 380, 61 L.Ed. 746, that the owner of rights in a non-navigable tributary is protected in his rights against improvements in the navigable stream to which it is tributary even though such improvements may be made in the interest of navigation. There was no dissent by the author of the opinion in State of Oklahoma ex rel. Phillips v. Guy F. Atkinson Co., supra.

on the following statements in that opinion, 313 U.S. page 523, 61 S.Ct. page 1058: "The fact that portions of a river are no longer used for commerce does not dilute the power of Congress over them. * * * And it is clear that Congress may exercise its control over the non-navigable stretches of a river in order to preserve or promote commerce on the navigable portions. * * *" 313 U.S. page 525, 61 S.Ct. page 1059: "There is no constitutional reason why Congress cannot under the commerce power treat the watersheds as a key to flood control on navigable streams and their tributaries. Nor is there a constitutional necessity for viewing each reservoir project in isolation from a comprehensive plan covering the entire basin of a particular river. * * * We have recently recognized that 'Flood protection, watershed development, recovery of the cost of improvements through utilization of power are * * * parts of commerce control' * * * And we now add that the power of flood control extends to the tributaries of navigable streams."

In the effort to apply these statements to the instant situation the defendants' contention amounts to this: that the San Joaquin River is, or has been in some of its stretches, navigable; that it is all part of a comprehensive plan to control the watershed of all the rivers in the Central Valley, called the Central Valley Project, by Congress; that the particular portion of the San Joaquin River involved in this case has contributed to water of the whole system, which caused floods; that such floods have interfered with and obstructed interstate commerce by washing out bridges and roads or depositing debris on highways over which interstate commerce is carried; and that, even though the contribution of the San Joaquin River to such floods might be small, nevertheless, it is tributary to them and thus any obstruction authorized by Congress which may impound the waters of such tributary can be used by the defendants to divert the entire flow of such tributary, regardless of the use to which such diversion is put, and regardless of any rights which Congress has said shall be recognized below such point of diversion under state law. The court cannot read that case, or any others, as supporting any such extreme extension of its doctrine as the defendants contend. The application and legal approval of this contention, if carried to its logical extreme, would give the defendants the power to divert every stream in the west—from mountain freshet to flowing rivers—to other uses than those to which they have been reasonably and beneficially put under applicable state law or even by adjudications in adversary proceedings merely because a flood that may occur in the incidence of once in 25 years may wash out a railroad culvert or a highway over which interstate commerce is carried, and thus obstruct the flow of interstate commerce. The extension of such doctrine would put every water right in California, if not the United States, in non-compensable jeopardy if somewhere some portion of the river system upon which that right depended, was navigable or caused floods. The application of such a doctrine, carried to its logical extreme, would, for instance, leave the city of Los Angeles and 28 other cities in Southern California, with a population of more than five million, depending on water from the Colorado secured through the state established Metropolitan Water District, subservient to some impoundment and diversion above Parker Dam which might be constructed under an appropriation made by Congress in aid of navigation or flood control of the Colorado River system as a comprehensive whole. It is not necessary to illustrate its application to the Mississippi River and tributaries. The mere statement of the contention is sufficient to refute it. The application of its extension explodes it as an instance of departmental zeal which is attempting to outrun the authority conferred by statute.[8]

8. The phrase is borrowed from Hughes, C. J. in his dissent in U. S. v. Macintosh, 1931, 283 U.S. 605–627, 51 S.Ct. 570, 75 L.Ed. 1302, which dissent was approved in Girouard v. U. S., 1946, 328 U.S. 61, at page 64, 66 S.Ct. 826, 90 L.Ed. 1084.

It is also significant that State of Oklahoma ex rel. Phillips v. Guy F. Atkinson Co., supra, was decided in 1940, and that thereafter Congress passed the Flood Control Act of December 22, 1944 (App. A–27) wherein certain appropriations were made for the Central Valley Project, and which provided that the construction, operation and maintenance of any works on waters arising in states lying wholly or partly west of the 98th meridian (roughly a north and south line following the eastern boundaries of the Dakotas) "shall be only such use as does not conflict with any beneficial consumptive use, present or future * * * of such waters for domestic, municipal, stock water, irrigation, mining, or industrial purposes."

Thus, if the dam is in aid of flood control, this Act of Congress protects the plaintiffs in their rights, in addition to such protection given by the Reclamation Laws.

In this connection it is significant that House Document No. 191 (pages 60–61) (73rd Congress, 2nd session), relied upon by the defendants, states that Friant Dam is to be built in the interest of irrigation and that no value is assigned to it in the interests of flood control.

Some point is made that House Document 146 of the 80th Congress (1st session) makes some mention of the fact that Friant is to be used for flood control, but, even so, the plaintiffs' rights would be protected under the above mentioned Act of December 22, 1944. In any event, this document was followed by Senate Document 113, 81st Congress (1st session), which affirmed plaintiffs' rights as hereinafter pointed out.

But whether Friant Dam is or is not for the improvement of navigation or flood control is wholly beside the point, as in the Act of August 26, 1937 (App. A–12) Congress provided that the provisions of the Reclamation laws should govern not only the construction of dams, but their *operation* and maintenance. And, in recognition of water rights existing under state law, it provided that the Secretary of the Interior was authorized "under the Reclamation Law," to purchase or condemn any such rights necessary for the purposes of the project. Thereafter, each Act of Congress relating to the Central Valley Project has made the appropriation *to* the Bureau of Reclamation. (See App. A–12 to 31.)

It is apparent beyond cavil that Congress intended that Friant Dam and its diversionary works should be built and operated under the Reclamation Law. Section 8 of the Reclamation Act of 1902 (App. A–3) requires the Secretary of the Interior in any work done thereunder, to recognize all water rights vested under state law in "any landowner, appropriator or user of water in, to, or from any interstate stream or the waters thereof." While neither the San Joaquin River nor the Sacramento River are interstate streams, it is clear that, nevertheless, the intention of Congress in specifically making the Central Valley project subject to the Reclamation Laws was that such private rights of landowners, appropriators, and users of water should be recognized in connection with the construction and operation of any of the works provided in the project, including Friant Dam and its diversionary works.

Section 8 of the Reclamation Act requires the Secretary of the Interior to proceed in conformity with the laws of any state wherein projects are constructed. The statutory laws of California are in the Constitution and Water Code, and provide an elaborate system of procedure for anyone who desires to appropriate water to file applications; for objections by any interested persons; for hearings and findings with an appropriate court review; all to the end of ascertaining whether or not any water is available in excess of that which is presently and prospectively put to beneficial and reasonable uses. California Water Code, Secs. 200–2900. While no specific allegation is made in the complaint that there is absence of compliance with the California Water Code by the defendants, yet in reading the entire complaint in the light of the arguments advanced by the defendants that the plaintiffs have no rights against the defendants, the conclusion is justified for the purposes of this motion to dismiss, that it appears that such compliance with the laws of California has not been made by the defendants.

In addition to the plain language of the Acts of Congress recognizing the rights of these plaintiffs, there is the presumption that Congress did not intend to take away those rights without just compensation or without due process. Calder v. Bull, 1798, 3 Dall. 386, 393, 1 L.Ed. 648; Trustees of Dartmouth College v. Woodward, 1819, 4 Wheat. 518, 625, 4 L.Ed. 629; Ogden v. Saunders, 1827, 12 Wheat. 213, 270, 6 L.Ed. 606; In re Sinking Fund Cases, 1878, 99 U.S. 700, 718, 25 L.Ed. 496, 504. And the recent case of Wong Yang Sung v. McGrath, 70 S.Ct. 445, where Justice Jackson quoted with approval the Japanese Immigrant Cases (Yamataya v. Fisher), 1903, 189 U.S. 86, 101, 23 S.Ct. 611, 47 L. Ed. 721, and pointed out that in those cases the court read into the statute the right to a hearing in order to save them from constitutional invalidity.[9] This is particularly true with relation to the long history of congressional recognition of water rights under state law, as property. For instance, Congress passed the Act of July 26, 1866 (App. A-1) concerning which the Supreme Court said, in Broder v. Water Company, 1879, 101 U.S. 274, 276, 25 L.Ed. 790: "It is the established doctrine of this court that the rights of persons who had constructed canals and ditches to be used for purposes of agricultural irrigation, in the region where the use of the water was an absolute necessity, are rights which the government had by its conduct recognized and encouraged and was bound to protect, before the passage of the Act of 1866. We are of the opinion that the Section of the Act which we have quoted (1866) was rather a voluntary *recognition of a preexisting right of possession* (italics in opinion) constituting a valid claim to its continued use, than the establishment of a new one." This doctrine was quoted with approval in the later cases of U. S. v. Rio Grande Dam & Irrigation Co., 1899, 174 U.S. 690, 691–705, 19 S.Ct. 770, 43 L.Ed. 1136, which concerned a navigable river where the court stated, 174 U.S. 704, 19 S.Ct. 775: "The effect of this statute was to recognize, so far as the United States are concerned, the validity of the local customs, laws and decisions of courts in respect to the appropriation of water." The above statement from the Broder case was again approved in California-Oregon Power Co. v. Beaver Portland Cement, 1935, 295 U.S. 142–155, 55 S.Ct. 725, 79 L.Ed. 1356.

Similar provisions are found in the Act of July 9, 1870, 16 Stat. 217, 218 and in the desert land Act of 1877, 19 Stat. 377, 43 U.S.C.A. § 321 et seq., and the timber land Act of March 3, 1891, 26 Stat. 1101, 43 U. S.C.A. § 946; and in the Federal Water Power Act of 1920, as amended, 16 U.S. C.A. § 791a et seq., supra. While all of these except the latter dealt with the disposition of the public domain, it is significant that they recognized and affirmed water rights which existed under state laws, as property. It is hardly conceivable that Congress recognizing such rights as property on the public lands would wholly ignore the existence of such rights existing on private lands as in the case here. And Congress has not done so.

The administrative interpretation by the Bureau of Reclamation in all the *reports* made *to Congress* recognizes the existence of the rights of the plaintiffs and their class, although counsel for the defendants contend to the contrary in this court in their briefs and arguments. The latest report filed with Congress is Senate Document No. 113, 81st Congress, 1st session, dated August 1949, almost two years after the within suit was filed. It is entitled (italics supplied):

"Central Valley Basin

"A Comprehensive Report on the Development of the Water and Related Resources of the Central Valley Basin for Irrigation, Power Production, and Other Beneficial Uses in California, and Comments by the State of California and Federal Agencies

---

9. It is not necessary to go to that length here in view of what has been said. The constitutional right to a hearing is no greater than the constitutional right not to have one's property taken without just compensation or a hearing as to whether or not the taking is necessary or is for a public use.

"The United States Department of the Interior, .

"J. A. Krug, Secretary
"*Sponsored by and prepared under the general supervision of the Bureau of Reclamation,*
"Michael W. Straus, Commissioner
"Richard L. Boke, Director, Region 2
"August 1949"

The report concedes that the works are constructed and operated under and subject to the reclamation laws, and states on page 39 as follows:

"Water, Land and Power Policies

"70. In conducting irrigation investigations and constructing and operating projects throughout the West, the *Bureau of Reclamation fully recognizes and respects existing water rights established under State law. Not only is this a specific requirement of the Reclamation Act under which the Bureau operates, but such a course is the only fair and just method of procedure. This basin report on the Central Valley is predicated on such a policy.*

"71. In addition to respecting all existing water rights, the Bureau of this report has complied with California's 'county of origin' legislation, which *requires that water shall be reserved for the presently unirrigated lands of the areas in which the water originates, to the end that only surplus water will be exported elsewhere. Next in importance after the areas having water rights and the counties of origin are* the areas now under irrigation systems but needing supplemental water. The water requirements of such areas have also been given priority over the needs of the new areas.

"72. The *beneficial consumptive use,* both *present* and future, of water for domestic, municipal, stock water, irrigation, mining, or industrial purpose *is considered superior to nonconsumptive uses such as navigation, and power. This principle is affirmed in the Flood Control Act of 1944* [58 Stat. 887] and the Rivers and Harbors Act of 1945 [59 Stat. 10] as to navigation, *and in the reclamation laws* as to power. In most cases, however, through proper coordination, all uses can be accomplished without conflict."

And at pages 64-65 the above is repeated in identical language.

It also provides on page 104:

"Water Rights and Future Irrigation of Mountain and Foothill Lands

"*Water rights for existing irrigation developments are superior to any which may accrue to new developments.* In so far as it may be economically feasible, it is planned to provide needed supplemental water for presently developed lands prior to irrigating new lands.

The Bureau's plan for the development of the water resources for the main valley floor not only would *operate consistently with existing water rights* but also would foster upper watershed development within practicable economic limits. Irrigation developments would not be feasible for some of the foothill lands on the east side of the Central Valley, except for the fact that additional use in the watershed would impair existing prior water supplies of valley lands. By furnishing the valley lands an improved water supply through storage in the major prospective reservoirs and canals, it would be possible to further develop certain of the upper lands which otherwise would be limited in their present status."

In addition to the foregoing and the portions of the Feasibility Report heretofore mentioned as being indicative of the representations made *to Congress,* is the testimony of one of the defendants before the Senate Lands Committee in May 1947, as follows: "There are certain existing rights downstream from Friant which have to be supplied. Including the riparian rights on the river between Friant and Mendota Pool, water needed for the preservation of fish life and waterfowl and losses from evaporation and seepage in the reservoirs and canals, it has been determined that 150,000 acre-feet of Class I water must be reserved to meet these requirements."

The representations *to Congress* are wholly inconsistent with, and completely at variance with the contentions of the defendants as above set out and as made to this

court and as claimed by the letter of defendant Boke of July 15, 1947, hereinbefore referred to.

Furthermore, it was stated by defendants' counsel, and the court can take judicial notice of the fact, that the Bureau of Reclamation paid approximately two million dollars to Miller and Lux for water rights below Mendota and agreed to furnish them water from the Sacramento River by the Delta-Mendota Canal, but denied that statutory or legal recognition of such rights was made in any of the Reclamation Acts or any of the other laws involved. In the face of the fact of the payment of the money, and in view of the position taken in the *reports to Congress* by the Reclamation Bureau, it is difficult to reconcile the position taken by counsel for defendants. The statement and colloquy on argument is set forth in Appendix D. The net effect of counsel's statement was that Miller and Lux had no water rights, that they were a large and rich corporation and would hold up the project by groundless litigation, to prevent which they were paid approximately two million dollars, and given a right to receive water from the Sacramento River by means of canals and pumping lifts costing the government many millions more, *without any statutory authority* for such payment of money. It is inconceivable that any government official would pay such large sums of money without statutory authority merely to prevent a lawsuit which they considered could have no foundation in law or fact. And the only logical conclusion, in spite of the rather startling explanation made by counsel, is that Miller and Lux did have water rights vested under state law and in recognition of those rights they were purchased under the Reclamation Laws. The rights of Miller and Lux may have covered more acres than the small farms of the plaintiffs but their rights under the law were no greater. The rights of the plaintiffs are just as vested and just as paramount against the government as those of Miller and Lux, whether or not the Friant Dam was built and operated in aid of navigation or flood control.

Congress making the Reclamation Laws applicable to the Central Valley Project and the works constructed under legislation relating to it, the situation is analogous to that which exists under the Federal Water Power Act, supra, which receives its constitutional vitality from the Commerce Clause. In Ford and Son v. Little Falls Fibre Company, 1930, 280 U.S. 369, 50 S.Ct. 140, 74 L.Ed. 483, the court had under consideration the question as to whether or not the dam constructed by the licensee under the Federal Water Power Act created a compensable damage. It was there strongly urged that, inasmuch as the dam constructed in that case was by a licensee under the Federal Water Power Act of June 10, 1920, supra, passed by Congress in the exercise of its power to regulate commerce on navigable streams, the damage complained of was not compensable. But the court held that, regardless of the extent of the power of Congress, they had nevertheless indicated an intention that such damage should be compensable, and said, 280 U.S. page 377, 50 S.Ct. page 141, "whether the Commission acted within or without its jurisdiction in granting the license, and even though the rights which the respondents here assert be deemed subordinate to the power of the national government to control navigation, the present legislation does not purport to authorize a licensee of the Commission to impair such rights recognized by state law without compensation. Even though not immune from such destruction, they are, nevertheless, an appropriate subject for legislative protection. See United States v. Realty Co., 163 U.S. 427, 16 S.Ct. 1120, 41 L.Ed. 215; Guthrie National Bank v. City of Guthrie, 173 U.S. 528-535, 19 S.Ct. 513, 43 L.Ed. 796; Joslin Mfg. Co. v. City of Providence, 262 U.S. 668, 675, 676, 43 S.Ct. 684, 67 L.Ed. 1167; Otis Co. v. Ludlow Mfg. Company, 201 U.S. 140, 141-152, 26 S.Ct. 353, 50 L.Ed. 696; Oswego & Syracuse R. R. Co. v. State, 226 N.Y. 351-356, 124 N.E. 8"; and further said, 280 U.S. page 378, 50 S.Ct. page 142: "while these sections are consistent with the recognition that state laws affecting the distribution or use of water in navigable waters and the rights derived from those laws may be subordinate to the power of the national government to regulate commerce upon them, they never-

theless so restrict the operation of the entire act that the powers conferred by it on the Commission do not extend to the impairment of the operation of those laws or to the extinguishment of rights acquired under them without remuneration."

In United States v. Cress, 1917, 243 U.S. 316, 37 S.Ct. 380, 61 L.Ed. 746, there was involved a non-navigable tributary of a navigable river. The Government built a dam in the navigable Kentucky River which backed up the water in the non-navigable tributary involved in the Cress case, to a point one foot below the crest of the mill dam, leaving an unworkable head. The doctrine of the Cress case was affirmed in United States v. Willow River Power Company, 1945, 324 U.S. 499, page 506, 65 S.Ct. 761, page 765, 89 L.E. 1101, where the court said, "the Court concluded that Cress was entitled to compensation as for a taking. It found that Cress had the right as a riparian owner to the natural flow-off of the water in this non-navigable stream. *The Cress case is significant in that it measured the rights of a riparian owner against the Government in improving navigation by the standard which had been involved to measure the rights of riparian owners against each other.* The rights of the Government at that location were held to be no greater than those of a riparian owner, and therefore, of course, not paramount to the right of Cress." (Italics supplied.)

Thus by making the Reclamation Laws applicable, Congress "measured the rights of riparian owners against the Government" by the standard which has been involved to measure the rights of riparian owners against each other. It was held in State of Nebraska v. State of Wyoming, 1935, 295 U.S. 40, at page 43, 55 S.Ct. 568, at page 569, 79 L.Ed. 1289, that the Secretary of the Interior in acquiring water rights under the Reclamation Laws must proceed "in the same manner as a private appropriator * * * under the state law." And in State of Nebraska v. State of Wyoming, 1945, 325 U.S. 589, at page 614, 65 S.Ct. 1332, 89 L.Ed. 1815, the court indicated that Sec. 8 of the Reclamation Act was a direction by Congress to the Secretary of the Interior to proceed in confor-

mity with state laws in appropriating water for irrigation purposes as in the position of an appropriator of water for storage under the laws of Wyoming. And in Mason Co. v. Tax Commission, 1937, 302 U.S. 186, 58 S. Ct. 233, 82 L.Ed. 187, the court held that Sec. 8 of the Reclamation Act preserves state control of water rights on the navigable Columbia River.

To uphold the contentions of the defendants would be to uphold as a proposition of law something which is neither justified by the Constitution nor the cases dealing with the subject, nor the Acts of Congress authorizing, nor the reports to Congress relating to the building of Friant Dam and diversionary works, or any of the whole comprehensive plan for the Central Valley of California.

It is clear, therefore, that *no Act of Congress,* either by any specific language therein *or* in contemplation of approval of *any reports made to Congress,* provided or contemplated that the plaintiffs should have no water rights, or authorized the taking of any water rights without just compensation.

This court concludes, therefore, that the plaintiffs and the members of their class, with lands below Friant and above Mendota, do have vested and valuable rights to the use of such amount of the entire flow of the San Joaquin River as they have, or can with reasonable methods, put to a reasonable and beneficial use for agricultural and domestic purposes; that such rights are property and are valuable; that Congress recognized and affirmed those rights as they exist under California laws between Friant and Mendota; that one of the purposes of the project was to protect said landowners in the reasonable and beneficial use of said waters for agricultural and domestic purposes; that there is nothing in any Act of Congress or any report submitted to Congress which indicates any intention to take away the water rights of plaintiffs; that such rights exist as a matter of law and not as a matter of grace or gratuity on the part of the defendants or any of them; that plaintiffs and their class have not consented to any taking of their water rights; that any owner of such rights

is free to freely sell the same to the Government; that Congress provided the authority and power to purchase such rights and thus there is no Act of Congress which authorizes the taking of plaintiffs' rights without just compensation, or which denies due process; that no proceeding in eminent domain has been started against plaintiffs or any members of said class to condemn their water rights or any portion of them, and that in the event such proceeding is commenced that would be the appropriate proceeding in which to raise the question as to the constitutional power of Congress to condemn one private landowner's water right for the sole purpose of giving or selling them to another private landowner for identical purposes, in or out of the same watershed, and that such question is not present in this case; that while there is nothing in any Act of Congress showing an intent to take plaintiffs' water rights either with or without compensation, and nothing in the Reports to Congress to that effect, it must be concluded from the allegations of the complaint and the position taken by the attorneys for the defendants in this case that the defendants threaten to take those rights without compensation by diverting the entire flow of the river at Friant Dam; that such taking would be an irreparable injury; that such acts are in excess of the power granted to the defendants by any Act of Congress and that hence the complaint states a cause of action for equitable relief by injunction against the defendants so far as the water rights of plaintiffs are concerned in relation to agricultural and domestic uses, unless the plaintiffs have a plain, speedy and adequate remedy at law, which question will shortly be examined.

 Turning now to the second and third assertions of right of use of the waters, viz.: for personal recreational purposes, and the replenishment of sand and gravel pits. The allegations of the complaint are vague as to whether or not plaintiffs contend these rights to be riparian or the equivalent thereof. No allegations are made of the existence of specific instances of the installation of recreational facilities, or sand and gravel installations of value on the land of any of the plaintiffs. If such exist, they can be made to appear as separate causes of action in an amended complaint, if the plaintiffs choose to file one. Such rights must await further factual showing by such amendment, by discovery, or by trial, before the nature and character of them or their compensability as a matter of law can be determined.

 For guidance of counsel it may be well to add a word in that connection: Whether or not the asserted rights of the plaintiff for personal recreational purposes and replenishment of sand and gravel pits exist is a question which turns upon one or both of the following propositions: whether or not such use is a reasonable and beneficial use under the law of California or a mere convenience which must yield to a higher and better use. Rancho Santa Margarita v. Vail, 1938, 11 Cal.2d 501, at page 561, 81 P.2d 533, and cases there cited; whether or not Friant Dam and its diversionary works are in fact in aid of navigation, or the control of floods in aid of interstate commerce. U. S. v. Commodore Park, 1945, 324 U.S. 386, 65 S.Ct. 803, 89 L.Ed. 1017; U. S. v. Willow River Power Company, 1945, 324 U.S. 499, 65 S.Ct. 761, 89 L.Ed. 1101; and U. S. v. Chandler-Dunbar Water Power Co., 1913, 229 U.S. 53, 33 S.Ct. 667, 57 L.Ed. 1063. The mere fact that Congress has designated the dam as a multiple purpose dam in aid of navigation and flood control, does not make it so. As said in U. S. v. Appalachian Electric Power Company, supra, 311 U.S. page 426, 61 S.Ct. page 308, 85 L.Ed. 243, "the United States cannot by calling a project of its own 'a multiple purpose dam' give to itself additional powers." Navigability and flood control are questions of fact. U. S. v. Rio Grande Dam & Irrigation Co., 1899, 174 U.S. 690, 19 S.Ct. 770, 43 L.Ed. 1136; U. S. v. State of Utah, 1931, 283 U.S. 64, 51 S.Ct. 438, 75 L.Ed. 844; State of Oklahoma v. State of Texas, 1922, 258 U.S. 574, 42 S.Ct. 406, 66 L.Ed. 771; Donnelly v. U. S., 1913, 228 U.S. 708, 33 S.Ct. 1024, 57 L.Ed. 1035, Ann.Cas.1913E, 710; U. S. v. Brewer-Elliott Oil & Gas Co.,

1918, D.C., 249 F. 609, affirmed 260 U.S. 77, 43 S.Ct. 60, 67 L.Ed. 140; The Montello, 1874, 20 Wall 430, 22 L.Ed. 391.

Congress by declaring, Act of August 26, 1937 (App. A-12), that the works to be constructed under the Central Valley Project were for river regulation, improvement of navigation, flood control, irrigation and domestic uses and power, did not thereby declare that each and every dam or diversionary works constructed was solely for the improvement of navigation or flood control under the commerce clause. Such declaration coupled with the requirement that all such works would be constructed and operated under the Reclamation Laws, was rather that the relation to navigation, flood control, irrigation, river regulation or power, of each dam or works should be determined as a question of fact, with due regard to private rights and the rights of the State of California. I can see nothing in either U. S. v. Appalachian Electric Power, Co., supra, U. S. v. Chandler-Dunbar Water Power, supra, Ashwander v. Tennessee Valley, etc., 1936, 297 U.S. 288, 56 S.Ct. 466, 80 L.Ed. 688, State of Oklahoma ex rel. Phillips v. Guy F. Atkinson Co., supra, or the other cases cited by defendants or found on research, which conflicts with this conclusion.

Turning now to the fourth asserted right of use to the flow of the water for spawning and fishing of salmon and other fish for both general commercial purposes, and general recreational purposes of the plaintiffs and the public: There is great cogency in the argument of plaintiff that the Statutes of the United States, Act of August 14, 1946, 60 Stat. 1080 at page 1081 (App. A-30), recognized that adequate provision must be made in the construction by the United States of any dams or diversionary work for the conservation, maintenance and management of wildlife resources, and its habitat, and that in all reports to Congress provision is asserted to be made therefor in the construction and operation of the works involved. But the plaintiffs are not, as parties in interest, appropriately entitled to enforce any rights which may exist under such statutes. In the first place,

said Act of 1946 provides for a plan for such conservation and maintenance to be jointly approved by the head of the Federal Department or agency involved, and any state agency, if one exists, and the Secretary of the Interior, if migratory fowl are concerned, and there is no allegation in the complaint that any such general plan has ever been made or approved. Even though this were true, the plaintiffs would still not be entitled, as parties in interest, to enforce maintenance of a flow for commercial or recreational fishing or spawning for the reason that the State of California, not only in the Water Code, but in the Fish and Game Code, has placed that responsibility upon public officials. The State of California has not intervened or attempted to intervene in this case, although it did file a brief, amicus curiae, in support of the plaintiffs' position in respect to fish. However, on the date of the argument, a Deputy Attorney General of the State of California stated that the State was not yet ready to take a position and, in effect, disclaimed the brief amicus curiae previously filed. It is too plain to need argument that a citizen cannot compel compliance where that duty is lodged with regularly selected officials whose duties are clearly defined by statute, any more than a private citizen could step in and assume the duties of a prosecuting attorney or governor, unless they were duly elected as provided in the constitution and laws of the state. Whether or not the plaintiffs by mandamus against the California officials could compel them to act is not before the court. Whether or not any rights for fishing purposes are to be asserted to the flow of the river is up to the State of California and its appropriate officials. The complaint in this case does not state a cause of action for relief in that respect.

The defendants' counsel contend that the complaints do not state a cause of action for declaratory relief in so far as the contracts for the diversion of water are concerned. In this respect they are correct. The United States is not a party to the suit, and is not indispensable to the relief otherwise sought in the suit, as elsewhere herein appears. The contracts with

the Madera Irrigation District and the South San Joaquin Municipal Utility District are made in the name of the United States and the rights of the plaintiff can be preserved against them upon hearing or trial if they are found to be entitled to injunctive relief.

It is contended that the United States is an indispensable party; that this is in effect a suit against the United States, and that no permission has been given to sue the United States in such an action. But as seen from the foregoing discussion, the defendants in withholding the water from the plaintiffs' use, and threatening to do so, are exceeding any powers granted to them by the Act of Congress. That being so, neither the United States nor the Secretary of the Interior are indispensable parties, and this is not a suit against the United States. The situation falls squarely within the doctrine of the test whether or not an injunctive decree would expend itself upon the United States because of authorization of the alleged taking of the plaintiffs' rights by an Act of Congress, or will prevent the defendants from doing acts which are unlawful because not authorized.

In view of the fact that no statutory authority exists for the actions of the defendants, and that they are withholding and threaten to withhold water from the plaintiffs in excess of and contrary to the powers conferred upon them, such a decree obviously brings the situation clearly within the line of cases of United States v. Lee, 1882, 106 U.S. 196, 1 S.Ct. 240, 27 L.Ed. 171; Philadelphia Company v. Stimson, 1912, 223 U.S. 605, 32 S.Ct. 340, 56 L.Ed. 570; Ickes v. Fox, 1937, 300 U.S. 82, 57 S. Ct. 412, 81 L.Ed. 525; Work v. State of Louisiana, 1925, 269 U.S. 250, 46 S.Ct. 92, 70 L.Ed. 259; Goltra v. Weeks, 1926, 271 U.S. 536, 46 S.Ct. 613, 70 L.Ed. 1074; Payne v. Central Pacific R. Co., 1921, 255 U.S. 228, 41 S.Ct. 314, 65 L.Ed. 598; Scranton v. Wheeler, 1900, 179 U.S. 141, 21 S.Ct. 48, 45 L.Ed. 126; State of Colorado v. Toll, 1925, 268 U.S. 228, 45 S.Ct. 505, 69 L.Ed. 927; and Land v. Dollar, 1949, 330 U.S. 731, 67 S.Ct. 1009, 91 L.Ed. 1209; and the recent case of Williams v. Fanning, 1947, 332 U.S. 490, 68 S.Ct. 188, 92 L.Ed. 95.

In that case the local postmaster was sued, and contended that the Postmaster General was an indispensable party to the suit. The court did not agree and said as to the local postmaster, 332 U.S. at page 494, 68 S.Ct. at page 189: "It is he who refuses to pay money orders, who places the stamp 'fraudulent' on the mail, * * * to the senders." So here it is the defendants before this court who refuse to turn the floodgates to release the impounded water, and who have been and are threatening to continue to divert those waters so the plaintiffs will be as effectively deprived of the use of the waters to which they are entitled, as was the individual whose mail was stopped and not delivered to him by the act of the local postmaster in Williams v. Fanning, supra.

If the defendants have been imprudent or exceeded their statutory authority by over-commitments for water to be diverted at Friant, these plaintiffs and their class cannot be made to suffer for the defendants' mistakes or unlawful conduct.

The defendants contend that the plaintiffs have a plain, speedy and adequate remedy at law under the Tucker Act [see 1948 Revised Judicial Code, 28 U.S.C.A. §§ 1346, 1402, 1491 et seq.], or by suit in the Court of Claims. Such remedy is neither plain nor speedy nor adequate. It is not plain because defendants by the letter of Boke, July 15, 1947, take the position that if the plaintiffs ever had any rights, the statute of limitations ran against them on October 20, 1947; it is not plain because the defendants contend, in this case and in the motions to dismiss filed in the Tucker Act suits filed by these individual plaintiffs, that the plaintiffs have never had any rights whatsoever against any action of the defendants in taking and diverting the entire flow of the river and thus destroying the value of their lands; it is not plain because the taking of plaintiffs' rights is a gradual and uncertain thing, quite unlike the taking by flooding of "fast lands" when an owner can visually see by the height of a dam that his lands will be flooded, or the owner of a wharf that his wharf will be on dry land or inundated; it is not plain because there is not any statutory authority

for taking plaintiffs' water at all and thus the plaintiffs cannot learn from the statutes, or even from the reports of the Department of the Interior to Congress that their lands will be taken; they can only learn of the taking as the water supply is gradually diminished, so that they are not, and cannot be, in a position to know just when the value of their lands will disappear as a result of the taking of their water by defendants; the taking is a matter which, according to the position of defendants, lies wholly in their personal discretion, and it is not plain just when that discretion was or will be exercised, or when it may be changed in the future. It is not speedy for the reason it is not plain and because the defendants may be put to successive suits for damage as the value of their land diminishes from the taking of their water. U. S. v. Dickinson, supra. And it is not adequate for all of these reasons. If the position of defendant Boke is correct, that the Statute of Limitations expired on October 20, 1947, then the members of the class have no remedy at law, much less a plain, speedy and adequate one.

It was said in Land v. Dollar, 1947, 330 U.S. 731, at page 738, 67 S.Ct. 1009, at page 1012, 91 L.Ed. 1209: "But public officials may become tort-feasors by exceeding the limits of their authority. And where they unlawfully seize or hold a citizen's realty or chattels, recoverable by appropriate action at law or in equity, he is not relegated to the Court of Claims to recover a money judgment. The dominant interest of the sovereign is then on the side of the victim who may bring his possessory action to reclaim that which is wrongfully withheld." See also Belknap v. Schild, 1895, 161 U.S. 10, at page 18, 16 S.Ct. 443, 40 L.Ed. 599; Williams v. Fanning, supra. By the same token, he is not compelled to wait until the damage is done in such a case as this, before attempting to retain his rights in an equity suit for injunction.

■ It is next contended that the eleven individual plaintiffs in this case made an election by virtue of having filed suits under the Tucker Act and are estopped to proceed with this action. The filing of the suits under the Tucker Act is not an election. They seek only damages in those cases to the date of filing the suit, whereas in this injunction action there is alleged a continuing damage and an irreparable injury. If the defendants rely on estoppel, it must be affirmatively pleaded. F.R.C.P. 8(c). The facts in this case are clearly distinguishable from the facts in Great Falls Mfg. Co. v. Attorney General, 1888, 124 U.S. 581, 8 S.Ct. 631, 31 L.Ed. 527 where, after judgment for a completed damage under an authorized taking for a public use, an injunction was sought to prevent the taking. 124 U.S. page 598, 8 S. Ct. page 637. It cannot be overlooked that in the motions to dismiss the Tucker Act cases the United States contends, as do the defendants here, that the plaintiffs have no rights at all, a considerably different situation than in that case. Nor do the defendants come within Hurley v. Kincaid, 1932, 285 U.S. 95, 52 S.Ct. 267, 76 L.Ed. 637, because the legal authority of the defendants to take the plaintiffs' property was there conceded. Where that is the case, which is not so here, the court merely held plaintiffs could not enjoin because they were not paid in advance.

■ The "physical solution" asked for is just another way of asking that this court determine the total amount of water which each plaintiff and each member of their class has vested in each separate parcel of land for reasonable and beneficial uses under the California Constitutional Amendment of 1928 and the California Water Code and the cases construing those provisions, and to restrain the defendants from taking any but the excess of such total waters of the river as are put to reasonable and beneficial uses. That is the sense in which such decrees were entered in Peabody v. Vallejo, supra, and Rancho Santa Margarita v. Vail, supra. And while that term was not used that was the effect of the decree in Katz v. Walkinshaw, supra, establishing the correlative rights doctrine to waters in California.

■ The demand for "inverse" or "reverse" condemnation is simply a demand for damages. The complaint states no cause of action against the United States for the reason that the United States is not a

party and in such a case they would be an indispensable party; and they are not an indispensable party to this suit for injunction; furthermore no amount of damages is alleged to show jurisdiction in this court under the Tucker Act, even if the allegations were construed to be suits against the United States. Such a demand would contemplate a lawful taking, and although there is an allegation to the effect that the diversion and taking is for a "public use," there are also allegations that the taking is not for a public use. It appears from what has been said that there was and is no congressional intention to take plaintiffs' water rights at all. In view of the holding herein that the alleged acts of the defendants in depriving the plaintiffs of their water to date and threatening to take the entire flow of the river is beyond any authority of Congress, such demand could be construed as a demand for personal judgment against the defendants individually for a tortious and unlawful taking (Land v. Dollar, supra) under the F.R.C.P. which allows a court to grant whatever relief the facts in the case warrant, whether called for in the prayer of the complaint or not. But if plaintiff desires to press such demand as a claim for personal judgment against the defendants, or any of them, the complaint should be amended, and such cause of action separately stated as to each claimant.

■ It is also contended that plaintiffs have slept on their rights and that equity does not protect those who do so. No extended discussion is necessary on this point. It is clear from what has been said that Congress did not authorize the taking of their water rights, much less without compensation; that the reports to Congress emphasized that their rights would be affirmed and respected; that, from the allegations of the complaint, the defendants and their predecessors have made repeated statements to them and to the public at large, and in public places, that their rights would not be taken and would be respected, and by means of threats and other coercive tactics lulled them into a position of security, until the letter of Boke of July 15, 1947, purporting to allow them only a short period after which the defendants would take their water without compensation and until the defendants took the position in this case that plaintiffs have no rights at all. In such a situation a court of equity cannot give ear to the claim of laches. There is nothing to the defendants' point in this respect, on this motion to dismiss. Moreover, laches is a special defense and must be pleaded as such. F.R.C.P. rule 8(c).

■ We come finally to the contention of the defendants that this is not a class action. Class actions are the creature of equity. They grow out of the necessity to do justice in situations where, by strict application of the rules of law, only those in interest were permitted to be actual parties to an action. Story, Equity Pleading, 2d Ed. § 98; Smith v. Swormstedt, 1853, 16 How. 288, 14 L.Ed. 942; Beatty v. Kurtz, 1829, 2 Pet. 566, 7 L.Ed. 521. The principle found codified expression in old Equity Rule 38. And Rule 23(a) of the F.R.C.P. is a substantial restatement of that Equity Rule with a statement in an effort to clarify the classes of rights which may be involved. Because the rule is codified makes it nonetheless a rule to be applied under equitable principles. Whitehead v. Shattuck, 1890, 138 U.S. 146-150, 11 S.Ct. 276, 34 L.Ed. 873. Thus, no hard and fast statement can be made which will fit every situation which might arise for its application.

■ Are the parties so numerous as to make it impracticable to bring them all before the court? The answer to that question does not depend upon mere numerical count, but is relative according to the situation as it exists. Here there are more than 1100 landowners alleged to have lands situated between Friant and Mendota Dam. If each filed a separate suit, all seeking the same thing, viz.: the natural flow of the river, there would surely be a multiplicity of actions. Here, it is alleged, they were told on or about July 17, 1947, that unless they brought suit before October 21, 1947, they would lose their water rights without compensation, after having been told for 14 years (1933—the date of the adoption

of the California Central Valley Statute, supra, and see discussion of Reports to Congress, supra) that their rights would be respected and would not be taken. As anyone knows who has attempted to do so, it is not a simple and quick operation to draw a complaint asserting water rights, and it is particularly so in this case because of the confusing number of statutes involved as demonstrated by Appendix A, and because of the many voluminous departmental reports involved (some of them hundreds of pages in length, and only a few of them available at any place other than in the various departments at Washington, D. C.). To expect more than 1100 farmers under such circumstances to each secure a separate lawyer who would be required to do extensive research and file suit within three months (the court does not mean to affirm the position of defendants that any statute of limitations expired on October 20, 1947) is a factor that weighs heavily in any equitable consideration as to whether or not the members of the class are numerous enough to meet the requirements of F.R.C.P. 23. It is finally a matter of judicial discretion. This court holds that this requirement of a class action is met.

Will those before the court fairly insure the adequate representation of all? Here, likewise, the answer to this question depends upon the circumstances. It cannot be said that counsel the plaintiffs have chosen is lacking in character, assiduity, energy or ability. Nor can it be said, and no suggestion is made to the effect, that the plaintiffs are lacking in that personal character necessary to be proper representatives of those similarly situated. The nature of the right involved must also be considered. But, as will shortly be seen, there is nothing in that connection which would make the separate rights among the plaintiffs and the members of the class inimical to each other so as to prevent adequate representation of the class by the plaintiffs. The court holds that this requirement of a class action is met.

Is the character of the right involved sufficient to meet the requirement of community of interest or right, so as to bring the case within equitable principles and the requirements of F.R.C.P. 23? It is this element which is the most varied. It is less possible of being put in capsule form than any. The rights involved here are water rights. The nature and character of the rights covered by F.R.C.P. 23 are to be determined in this instance under laws of the state of California. Water rights on rivers—while separately owned according to the size of each parcel of land or the time and extent of the appropriative or prescriptive right of the owner—are and for many years have been determined on the basis of the watershed or some other common source of supply to the end that water—which is ultimately not consumed but only used—may be equated between those who have a right to use it in its journey from the skies to the seas, howsoever long that journey may be. The rights here are part and parcel of the land and are to be determined under the law of the State of California as hereinbefore indicated. Katz v. Walkinshaw, supra, is not only authority for the doctrine of correlative rights among owners of water rights, but is also authority for the proposition that underground waters, whether stored, percolating or flowing, are common to all, although correlative to one another, where the source is common. In Atchison v. Peterson, 1874, 20 Wall. 507, 22 L.Ed. 414, the court affirmed the proposition generally that water rights were, 20 Wall. page 511, "common to all the proprietors on the river * * *" and that there was "* * * perfect equality of right among all the proprietors of that which was common to all." It is needless here again to call attention to all the cases elsewhere cited in this memorandum in support of that proposition or of the proposition that riparian, appropriative and prescriptive rights to both surface and underground waters are of equal legal standing in California against subsequent claimants.

Sec. 685 of the California Civil Code provides that an interest in common is one owned by several persons, not in joint ownership. Sec. 686 of the same Code provides that every interest created in favor of

several persons in their own right is an interest in common. The water rights involved here were "created" in favor of each of the plaintiffs and each member of the class by the constitution and laws of the State of California and each owner of each parcel of land owns his right to the use of the water in his own right. As between the separate plaintiffs and each member of the class there is no question of "joint" ownership as that type of ownership is defined and recognized under the laws of the State of California, the principal elements of which are equal shares, express creation of a joint ownership, and the right of survivorship.

■ Sec. 382 of the California C. C. P. provides for virtual, or class, representation, and is couched in almost the same terms as F.R.C.P. 23. In Coachella Valley County Water Dist. v. Stevens, 1929, 206 Cal. 400, 274 P. 538, 542, the court had under consideration the question as to whether or not it was a class action as to the owners or those claiming or benefited by the waters of the Whitewater River, including owners and users of both surface and underground waters, whether for agricultural purposes or for domestic purposes of the inhabitants of the towns which depended upon wells. While the court held that there was specific statutory authority under the laws of California to support the plaintiffs' right to bring the suit, it stated: "And this power the district unquestionably possesses not only under the clear provisions of the act but under well-recognized principles of equity jurisprudence. Conceding properly, as the defendant does, that an action would lie on behalf of each landowner in the district to protect his individual right, it would necessarily follow that under section 382 of the Code of Civil Procedure one might sue for the benefit of all. See Miller v. Bay Cities Water Co., 1910, 157 Cal. 256, 288, 107 P. 115, 27 L.R.A., N.S., 772.

In Miller v. Bay Cities Water Co., supra, the plaintiff was an individual owning 21 acres planted to peaches which received their water supply from an artesian well fed by underground waters from the Coyote River. He sought and received an injunction to restrain the diversion of "any" waters of the river. He did not claim to sue as a representative of a class, but the court nevertheless in granting the relief took that into consideration and said the relief was necessary to "meet the needs of those hundreds of property owners whose land is situated above the various old branch channels, all having their intake into the gravel beds at the lower gorge * * * ," [157 Cal. 256, 107 P. 120] and in the concurring opinion said, "Plaintiff is but one of these, but he represents a large population engaged in like pursuits."

In Marolda v. La Piner, 1947, 81 Cal. App.2d 742, 185 P.2d 40, 42, the plaintiffs sued individually and as representatives of a class of homeowners who received their water from a well owned by the defendants. A demurrer was interposed on the ground, among others that it was not a class action because there was shown to be no contractual relation between the members of the plaintiffs' class, and thus no authority for granting a temporary injunction. As to this the court said: "The uncontroverted allegations of the complaint were sufficient, under section 382 of the Code of Civil Procedure, to confer jurisdiction on the court to order the temporary injunction as to the class claimed to be represented by the plaintiffs."

Lindsay-Strathmore Irrigation Dist. v. Superior Court of Tulare County, 1920, 182 Cal. 315, 187 P. 1056, 1060, was a proceeding in prohibition to prevent the local judge of the Superior Court from proceeding further with the litigation. He had tried the case, made his decision and filed his findings of fact and conclusions of law, when the original proceeding was started in the Supreme Court to prohibit him from taking further action to carry his decision into effect. The complaint alleged that all parties owning lands within the area described or diverting water were united in interest and so numerous as to make it impracticable to bring them all before the court and that the action was brought for the benefit of all of said parties. The defendant Judge owned a lot in the city of Visalia. He did not use the water under his property but bought his water from

the Visalia Water Company which produced its water from wells within the area described in the complaint. The court held he was within the class for which the suit was brought, and that he was disqualified under Section 170 of the California Code of Civil Procedure in that he had an interest in the subject matter, saying, "The cause of action is not for plaintiffs alone, but for all other persons within the delta who have a like interest with the plaintiffs. Code of Civil Procedure § 382."

In Noroian v. Bennett, 1919, 179 Cal. 806, 179 P. 158, the court held there was an improper joinder, but quoted with approval 1 Pomeroy's Equity Jurisprudence, 3d Ed., Sec. 269, and, among other things concerning the quotation said, 179 Cal. 809, 179 P. 159, "In speaking of 'a community of interest' in the questions of law and fact involved, the author was referring to cases where a single fact was decisive of the claim of all the parties concerned, as where persons owning separate rights in the waters of a stream are injured by a diversion of the water higher upon the stream by another person * * *."

In Everglades Drainage League v. Napoleon B. Broward Drainage Dist., D.C., 1918, 253 F. 246, appeal dismissed 251 U.S. 567, 40 S.Ct. 219, 64 L.Ed. 418, a three-judge court held that the class suit was proper even though each complainant was interested in the subject matter in different amounts and was differently connected with the whole dispute.

In Sprague v. Ticonic Nat. Bank, 1939, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184, the court had before it an application for attorneys' fees and costs over and above the regular taxable costs. The action was not brought as a class action, but it was asserted that the efforts of plaintiff had nevertheless resulted in benefit to a class whose rights to a common fund were established by the litigation. The fees and costs were allowed on the basis that plaintiff had established the rights of others to a common fund, under the doctrine of stare decisis. 307 U.S. page 166, 59 S.Ct. 777.

It would be redundant to cite and review the numerous cases supporting class actions to trust funds. Many are collected in the annotation following Rule 23 in 28 United States Code Annotated. See also 3 Ohlinger's Fed. Practice, p. 339, et seq.; 3 Moore Fed. Practice, p. 3401, et seq.

While the cases heretofore mentioned are sufficient to establish the within suit as a class action concerning water rights under the California law, the instances of analogy between the within situation and the trust fund cases is not without point. There, the common source is a fund created by activities in a business venture or some other effort of men; here the common source is created and supplied by nature; there the money is not consumed, but used, as here the water is not consumed but used: it is unlawful to mutilate or to destroy money, and it is unlawful to destroy, i. e. waste water. Actually a person does not own money, but the right to its use, and after being used it flows on to another for use down the stream of circulation of money; so, by the California law, one does not own water, but the right to its use, and after he has such use it then flows on its course to be used by another in its flow.

It is conceded that each of the individual plaintiffs and each member of the class they claim to represent would be entitled to different quantities of water for their use as their acreage or appropriative or prescriptive rights might vary and that they may have disputes between themselves or rights one against another. But their common source of supply is the same, viz.: the one river; and there is but one act of taking in the impoundment of all the water of the river and its threatened diversion by the defendants at one dam. Whether the suit is a true class action, or hybrid, or spurious, is not now necessary to determine, as the allegations of the complaint are sufficient to bring it within the ambit of the rule on a motion to dismiss under the authorities above referred to. Such a decision will be deferred until sufficient facts are before the court, either by amendment to the complaint or by discovery or by trial, which will more clearly disclose the extent of the class either by legal description of the area or by ownership of lands, or other criteria

from which a conclusion necessary to such decision can be drawn. In this connection the provisions of F.R.C.P. 19(b) are not to be overlooked. Under it the court may order process to be served upon all the members of the class, if in the court's discretion it may be necessary to accord complete relief between the parties.

## No. 668—Jasper

The plaintiff in this case is the individual owner of land lying, as do those of the plaintiffs, in No. 685, below Friant and above Mendota. She sues for herself and not for a class. Otherwise this complaint follows almost exactly the allegations of the complaint in the Rank case with relation to water rights for agricultural and domestic purposes, except that a specific damage is alleged to the date of filing the complaint in a sum less than ten thousand dollars. The United States is not made a party. What has been said in the Rank case with relation to a cause of action for injunction and for damage, is equally applicable to the complaint in this case. She does state a cause of action for equitable relief, and the motions to dismiss are denied. If the plaintiff intends to press the claim for damages against the named defendants personally, it will be necessary for her to amend the complaint and separately state it.

Moreover, service of process does not appear to have been made on any of the defendants personally, although by consent the motion to dismiss is deemed to have been made as in the Rank and Cervelli cases and has been so considered.

## No. 681—Cervelli

The lands of the plaintiffs in this case, like those of the plaintiffs in the Rank case and the Jasper case, lie below Friant and above Mendota. The allegations of the complaint are almost identical to those of the Jasper case. What is said with relation to the Rank case and the Jasper case therefore applies with equal force here.

▮ In this case, however, service of process was made on the defendants Boke, Blote, Durant and Rodner, as well as the Madera Irrigation District and South San

Joaquin Municipal Utility District in the state of California where it appears that each of them reside. The questions of law decided in the Rank case apply with equal force to the above-named defendants who have been served in this case.

In addition, service of process was made on the defendant Krug, the then Secretary of the Interior, and the defendant Straus, the Director of the Bureau of Reclamation, in Washington, D. C. The U. S. Attorney has moved to quash the service on Krug and Straus only, on various grounds. It is unnecessary to consider all the points made in connection with that motion. It appears that they were both residents of Washington, D. C., or of some place other than California. The service was made in January, 1948, before the new Judicial Code became effective on September 1, 1948, and hence Sec. 118 of the former Title 28 U.S.C.A. applies [see 1948 Revised Judicial Code, 28 U.S.C.A. § 1655]. The record fails to show compliance with that section in that there was no prior order of court "directing such absent defendant or defendants to appear, plead, answer, or demur by a day certain to be designated." Such an order is a preliminary prerequisite to valid service of process. The motion to quash is granted on that ground and no other, as to the defendants Krug and Straus.

## No. 680—Hollister

The allegations of this complaint follow the allegations of the Rank case. It likewise is cast as a class action. The only difference between this action and the Rank case is that all the lands of the plaintiffs and the class for which they sue are located on the San Joaquin River *below* Mendota. But it is equally clear that Congress did not intend to take them without compensation as the Reclamation Laws and the Act of December 22, 1944 (App. A-3; App. A-27) were made equally applicable to them as to all the other lands involved in the Central Valley Project.

Whether it is clear from the Reports of the Reclamation Bureau and the Feasibility Report *to Congress* that there was an intention to take all water below Mendota as

held in the Gerlach cases, supra, or not, the fact remains that if such taking is to be done it must be done under the Reclamation laws (App. A-3), and the Act of December 22, 1944 (App. A-27), in recognition of existing rights as more fully appears in the discussion concerning the Rank case. The complaint, therefore, states a cause of action for equitable relief in so far as the rights of the plaintiffs involve the use of water for agricultural and related purposes, and for domestic uses.

If the plaintiffs intend to press their claim for "inverse" or "reverse" condemnation as a claim for damages against the defendants personally, it will be necessary for them to amend their complaint and separately state such claim.

Furthermore, the record is not clear as to service of process, although the motion to dismiss, by consent, was deemed to have been made as in the Rank and Cervelli cases and has been so considered.

No. 832—Northern California Fisheries, etc.

 None of the plaintiffs in this case claim any riparian, appropriative or prescriptive rights to the waters on the San Joaquin River. Each of the plaintiffs is interested only on behalf of its members who either earn their living or otherwise commercially profit from the fishing industry, or for fishing as a recreational right. None of the plaintiffs herein are in any better position with respect to the right to have the flow of the river maintained for commercial and recreational fishing than are the plaintiffs in the Rank case. The plaintiffs are not parties in interest so as to permit them to maintain a suit for the reasons hereinbefore stated. The complaint in this case does not state a cause of action, and the motion to dismiss it is granted. Such a dismissal, of course, carries with it the denial of the motion for the injunction pendente lite. Whether such a suit would lie on behalf of the people of the state of California, is a question not present here, although touched on in the briefs.

 There remains for disposition the motion for an injunction pendente lite in the Rank case, No. 685-ND, and in the Hollister Land and Cattle Company case, No. 680-ND. In so far as these motions concerned themselves with the right to the flow of the river for commercial or recreational fishing, what has been said disposes of them.

In each of these cases the plaintiffs also sought injunctions pendente lite to compel the flow of the river to be maintained for their agricultural and domestic uses.

From what has been said it is clear that the plaintiffs and their class have rights; that all of the Acts of Congress relating to the dams and works involved recognized those rights; that such rights exist against any action by the United States or any of its officers or agents acting or purporting to act in an official capacity; and that any act of the defendants which will divert the entire flow of the river is in excess of their lawful authority so as to amount to a taking of the water rights of the plaintiffs and their class which are vested in them for agricultural and domestic uses.

It is unnecessary to review here the affidavits filed in connection with the motion for injunction pendente lite. It is clear from those filed in opposition to the motion that the defendants have been and are impounding all the flow of the river at Friant and will continue to do so and to divert the same except such as they may choose to release, without regard to the vested rights of the plaintiffs and their class, as those rights are shown to exist in the conclusions hereinbefore drawn. The affidavit of one Christian is of particular significance in this respect as it discloses the intention of the defendants to release only such amount of water from Friant Dam as the defendants in their untrammeled discretion may decide to "voluntarily" release. No standard is set up or suggested as to any manner of determining what they will "voluntarily" release, except previous contracts and previous purchases. In view of the position of the defendants the contracts appear to have been made without regard to plaintiffs' paramount rights, which, as indicated, are recognized by all the applicable Federal and State statutes and laws. It is difficult to understand how the previous purchases

could be a measure or standard of the right to impound and divert in view of the position taken in this court by counsel for the defendants with relation to the Miller and Lux contract. To uphold the defendants' contentions would be to make the assurances given to these plaintiffs and their class, with respect to their water rights, in the Acts of Congress and reports to Congress and in the laws of the State of California mere "teasing illusions". Ex parte Kawato, 1945, 317 U.S. 69, at page 78, 63 S.Ct. 115, 87 L.Ed. 58. The basic rights of the plaintiffs and their class to waters from the San Joaquin River for agricultural and domestic uses is clear; the injury is sure and impending; and it is irreparable.

But, even so, an injunction should not be granted except upon the clearest showing, so as to enable the court to make appropriate findings and make the decree specific in its terms and describe in reasonable detail the act or acts to be enjoined in accordance with F.R.C.P. 65. In the latter respect the showing is insufficient, particularly in view of the many thousands of acres of land involved; the lack of showing as to an accurate description of the lands in the class and the total amount of water required to fulfill the rights of the plaintiffs; the places of diversion; the quantities of water required to be delivered at what different points, that is, the total amount necessary to be allowed to pass Friant in order to be sufficient to make delivery at different points on the river. There is no showing as to how much water the use of which the government has purchased, or where the diversion rights of such purchase are located on the river, so that a decree could be framed which would take such matters into consideration.

And with relation to the lands below Mendota of the Grasslands Association, in addition to the foregoing, the showing is not clear as to whether or not their rights exist independent of Miller and Lux, or are subordinate to any rights which were purchased from Miller and Lux.

Accordingly, the motions for an interlocutory injunction in the Rank case, No. 685-ND, and the Hollister case, No. 680-ND, are denied without prejudice to their renewal at any time. And the motions to dismiss are denied in accordance with the foregoing memorandum.

### Appendix A

#### 1

Act of July 26, 1866, 14 Stat. 251, at page 253: "An Act granting the Right of Way to Ditch and Canal Owners over the Public Lands, and for other Purposes."

"Sec. 9. *And be it further enacted,* That whenever, by priority of possession, rights to the use of water for mining, agricultural, manufacturing, or other purposes, have vested and accrued, and the same are recognized and acknowledged by the local customs, laws, and the decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same; and the right of way for the construction of ditches and canals for the purposes aforesaid is hereby acknowledged and confirmed; *Provided, however,* That whenever, after the passage of this act, any person or persons shall, in the construction of any ditch or canal, injure or damage the possession of any settler on the public domain, the party committing such injury or damage shall be liable to the party injured for such injury or damage." 43 U.S.C.A. § 661, first paragraph—for second paragraph of section 661 see Act of July 9, 1870, included in this compilation; 30 U.S.C.A. § 51. .

#### 2

Act of July 9, 1870, 16 Stat. 217, at page 218: "An Act to amend 'An Act granting the Right of Way to Ditch and Canal Owners over the Public Lands, and for other Purposes.'"

"Sec. 17. And be it further enacted, That none of the rights conferred by sections five, eight, and nine of the act to which this act is amendatory shall be abrogated by this act, and the same are hereby extended to all public lands affected by this act; and all patents granted, or pre-emption or homesteads allowed, shall be subject to any vested and accrued water rights, or rights to ditches and reservoirs used in connection with such water rights, as may have been

acquired under or recognized by the ninth section of the act of which this act is amendatory. * * * " 43 U.S.C.A. § 661, second paragraph; the first paragraph of section 661 is found in the Act of July 26, 1866, included in this compilation.

### 3.

Act of June 17, 1902, 32 Stat. 388, 389, 390: "An Act Appropriating the receipts from the sale and disposal of public lands in certain States and Territories to the construction of irrigation works for the reclamation of arid lands." ("Basic Reclamation Law")

"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled.*

\* \* \* \* \* \*

"Sec. 2. That the Secretary of the Interior is hereby authorized and directed to make examinations and surveys for, and to locate and construct, as herein provided, irrigation works for the storage, diversion, and development of waters, * * *" 43 U.S.C.A. § 411.

"Sec. 7. That where in carrying out the provisions of this Act it becomes necessary to acquire any rights or property, the Secretary of the Interior is hereby authorized to acquire the same for the United States by *purchase* or by *condemnation* under judicial process, and to pay from the reclamation fund the sums which may be needed for that purpose, and it shall be the duty of the Attorney-General of the United States upon every application of the Secretary of the Interior, under this Act, to cause proceedings to be commenced for condemnation within thirty days from the receipt of the application at the Department of Justice." 43 U.S.C.A. § 421.

"Sec. 8. That nothing in this Act shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder, and the Secretary of the Interior, in carrying out the provisions of this Act, shall proceed in conformity with such laws, and nothing herein shall in any way affect any right of

any State or of the Federal Government or of any landowner, appropriator, or user of water in, to, or from any interstate stream or the waters thereof: *Provided,* That the right to the use of water acquired under the provisions of this Act shall be appurtenant to the land irrigated, and beneficial use shall be the basis, the measure, and the limit of the right." 43 U.S.C.A. §§ 372, 383.

### 4.

Act of June 25, 1910, 36 Stat. 835 at page 836: "An Act To authorize advances to the 'reclamation fund,' and for the issue and disposal of certificates of indebtedness in reimbursement therefor, and for other purposes."

"Sec. 4. That all money placed to the credit of the reclamation fund in pursuance of this Act shall be devoted exclusively to the completion of work on reclamation projects heretofore begun as hereinbefore provided, and the same shall be included with all other expenses in future estimates of construction, operation, or maintenance, and hereafter no irrigation project contemplated by said Act of June seventeenth, nineteen hundred and two, shall be begun unless and until the same shall have been recommended by the Secretary of the Interior and approved by the direct order of the President of the United States." 43 U.S.C.A. §§ 400, 413.

### 5.

Act of December 5, 1924, 43 Stat. 672 at page 702: "An Act Making appropriations to supply deficiencies in certain appropriations for the fiscal year ending June 30, 1924, and prior fiscal years, to provide supplemental appropriations for the fiscal year ending June 30, 1925, and for other purposes."

"Subsec. B. That no new project or new division of a project shall be approved for construction or estimates submitted therefor by the Secretary until information in detail shall be secured by him concerning the water supply, the engineering features, the cost of construction, land prices, and the probable cost of development, and he shall have made a finding in writing that it is feasible, that it is adapt-

able for actual settlement and farm homes, and that it will probably return the cost thereof to the United States." 43 U.S.C.A. § 412.

### 6.

Act of January 21, 1927, 44 Stat. 1010 at page 1014: "An Act Authorizing the construction, repair and preservation of certain public works on rivers and harbors, and for other purposes."

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the following works of improvement are hereby adopted and authorized, to be prosecuted under the direction of the Secretary of War and supervision of the Chief of Engineers, in accordance with the plans recommended in the reports hereinafter designated:

\* \* \* \* \* \*

"San Joaquin River and Stockton Channel, California, in accordance with the report submitted in House Document Numbered 554, Sixty-eighth Congress, second session, and subject to the conditions set forth in said document: *Provided,* That no expense shall be incurred by the United States for the acquiring of any lands required for the purpose of this improvement: *Provided further,* That in connection with this project the existing project for the improvement of Suisun Bay is modified so as to include authorization for a channel three hundred feet wide from the western end of that bay to the mouth of the San Joaquin, with a depth of twenty-six feet at mean lower low water over all or any part of this width.

"Sacramento River, California, in accordance with the report submitted in House Document Numbered 123, Sixty-ninth Congress, first session." (Not in U. S. Code.)

### 7.

Chapter 1042, Statutes of California 1933 (Approved by the Governor August 5, 1933. This chapter delayed from going into effect by referendum provisions of Section 1, Article IV, of the State Constitution. Pursuant to these provisions the Governor by proclamation called a special election, and said chapter was submitted to the people on December 19, 1933. The official declaration of the vote was made by the Secretary of State on January 8, 1934, as follows: Yes: 459,712 No: 426,109. Above chapter became effective January 13, 1934.)

Sec. 11. "In the construction and operation by the authority of any project under the provisions of this act no watershed or area wherein water originates, or any area immediately adjacent thereto which can conveniently be supplied with water therefrom, shall be deprived by the authority directly or indirectly of the prior right to all of said water reasonably required to adequately supply the beneficial needs of said watershed, area or any of the inhabitants or property owners therein. (Water Code, § 11460). In no other way than by purchase or otherwise as in this act provided shall said water rights as herein defined, of said watershed, area or the inhabitants be impaired or curtailed by the authority, but the provisions of this section shall be strictly limited to the acts and proceedings of the authority, as such, and shall not apply to any persons or State agencies. These provisions shall not be so construed as to create any new property rights other than against the authority as in this act provided or to require the authority to furnish to any person without adequate compensation therefor any water which shall have been made available by the construction of any works by the authority. (Water Code, § 11461).

"In the construction and operation by the authority of any project under the provisions of this act, no exchange of the waters of any watershed or area for the waters of any other watershed or area may be made by the authority unless the water requirements of the watershed or area wherein such exchange is made are first and at all times met and satisfied to the extent that such requirements would have been met were the exchange not made, and no right to the use of water shall be gained or lost by reason of any such exchange thereof. (Water Code, § 11463.)

"Sec. 12. \* \* \*

"The authority \* \* \* may take immediate possession and use of any property required for construction, operation and maintenance of said Central Valley Project

upon first commencing eminent domain proceedings * * * and thereupon giving such security * * * to secure to the owner of the property sought to be taken, immediate compensation for such taking, and any damage incident thereto, including damages sustained by reason of an adjudication that there is no necessity for taking the property. (Water Code, § 11587.)"

**8.**

Joint Resolution of April 8, 1935, 49 Stat. 115: "Making appropriations for relief purposes."

"That in order to provide relief, work relief and to increase employment by providing for useful projects, there is hereby appropriated * * * (b) rural rehabilitation and relief in stricken agricultural areas, and water conservation, trans-mountain water diversion and irrigation and reclamation, $500,000,000 * * * (h) sanitation, prevention of soil erosion, prevention of stream pollution, sea coast erosion, reforestation, forestation, flood control, rivers and harbors and miscellaneous projects, $350,000,000." (Not in U. S. Code.)

**9.**

Act of August 30, 1935, 49 Stat. 1028, at page 1038: "An Act Authorizing the construction, repair, and preservation of certain public works on rivers and harbors, and for other purposes."

"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the following works of improvement of rivers, harbors, and other waterways are hereby adopted and authorized, to be prosecuted under the direction of the Secretary of War and supervision of the Chief of Engineers, in accordance with the plans recommended in the respective reports hereinafter designated and subject to the conditions set forth in such documents; and that hereafter Federal investigations and improvements of rivers, harbors, and other waterways shall be under the jurisdiction of and shall be prosecuted by the War Department under the direction of the Secretary of War and the supervision of the Chief of Engineers, except as otherwise specifically provided by Act of Congress: (33 U.S.C.A. § 540, present Code Section taken from later Acts).

\* \* \* \* \* \*

"San Joaquin River and Stockton Channel, and Suisun Bay, California; Report of the Chief of Engineers dated June 10, 1933;

"Sacramento River, California; Rivers and Harbors Committee Document Numbered 35, Seventy-third Congress;

"Sacramento River and tributaries, California (debris control); Rivers and Harbors Committee Document Numbered 50, Seventy-fourth Congress;

"Middle River and connecting channels, California; Rivers and Harbors Committee Document Numbered 48, Seventy-second Congress: *Provided,* That no expense shall be incurred by the United States for the acquiring of any lands required for the purpose of this improvement; * * *." (Not in U. S. Code.)

**10.**

Act of June 22, 1936, 49 Stat. 1597 at page 1622: An Act Making appropriations to supply deficiencies in certain appropriations for the fiscal year ending June 30, 1936, and prior fiscal years, to provide supplemental appropriations for the fiscal years ending June 30, 1936, and June 30, 1937, and for other purposes."

"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the following sums are appropriated out of money in the Treasury not otherwise appropriated, to supply deficiencies in certain appropriations for the fiscal year ending June 30, 1936.

\* \* \* \* \* \*

"Title III— * * * Interior Department

\* \* \* \* \* \*

"Bureau of Reclamation

\* \* \* \* \* \*

"Central Valley Project of California: For continuation, $6,900,000 to remain available until June 30, 1937, of which $6,000,000 shall be available for construction of Friant Reservoir and irrigation facilities therefrom in the San Joaquin Basin * * *

and to be reimbursible under the Reclamation Law." (Not in U. S. Code.)

## 11.

Act of August 9, 1937, 50 Stat. 564, at pages 592 and 597: "An Act Making appropriations for the Department of the Interior for the fiscal year ending June 30, 1938, and for other purposes."

\* \* \* \* \* \*

"Bureau of Reclamation

"The following sums are appropriated out of the special fund in the Treasury of the United States created by the Act of June 17, 1902 (U.S.C., Title 43, secs. 391, 411), and therein designated 'the reclamation fund', to be available immediately:

\* \* \* \* \* \*

"For the continuation of construction of the following projects and for general investigations in not to exceed the following amounts, respectively, to be expended from the general fund of the Treasury in the same manner and for the same objects of expenditure as specified for projects included hereinbefore in this Act under the caption of 'Bureau of Reclamation', and to be reimbursable under the reclamation law:

"Central Valley project, California, $12,-500,000, together with the unexpended balance of the appropriation for this project contained in the First Deficiency Act, fiscal year 1936; \* \* \*." (Not in U. S. Code.)

## 12.

Act of August 26, 1937, 50 Stat. 844, at page 850: "An Act Authorizing the construction, repair, and preservation of certain public works on rivers and harbors, and for other purposes."

\* \* \* \* \* \*

"Sec. 2. That the $12,000,000 recommended for expenditure for a part of the Central Valley project, California, in accordance with the plans set forth in Rivers and Harbors Committee Document Numbered 35, Seventy-third Congress, and adopted and authorized by the provisions of section 1 of the Act of August 30, 1935 (49 Stat. 1028, at 1038), entitled 'An Act authorizing the construction, repair and preservation of certain public works on riv-

ers and harbors, and for other purposes', shall, when appropriated, be available for expenditure in accordance with the *said plans* by the Secretary of the Interior instead of the Secretary of War: *Provided,* That the transfer of authority from the Secretary of War to the Secretary of the Interior shall not render the expenditure of this fund reimbursable under the reclamation law; *Provided further,* That the entire Central Valley project, California, heretofore authorized and established under the provisions of the Emergency Relief Appropriation Act of 1935 (49 Stat. 115) and the First Deficiency Appropriation Act, fiscal year 1936 (49 Stat. 1622), is hereby reauthorized and declared to be for the purposes of improving navigation, regulating the flow of the San Joaquin River and the Sacramento River, controlling floods, providing for storage and for the delivery of the stored waters thereof, for the reclamation of arid and semiarid lands and lands of Indian reservations, and other beneficial uses, and for the generation and sale of electric energy as a means of financially aiding and assisting such undertakings and in order to permit the full utilization of the works constructed to accomplish the aforesaid purposes: *Provided further,* That, except as herein otherwise specifically provided, the provisions of *the reclamation law,* as amended *shall govern* the repayment of expenditures and the construction, operation, and *maintenance of the dams, canals, power plants, pumping plants, transmission lines, and incidental works deemed necessary* to said entire project, and the Secretary of the Interior may enter into repayment contracts, and other necessary contracts, with State agencies, authorities, associations, persons, and corporations, either public or private, including all agencies with which contracts are authorized under the reclamation law, *and may acquire by proceedings in eminent domain, or otherwise, all lands, rights-of-way, water rights,* and other property necessary for said purposes: *And provided further,* That the said dam and reservoirs shall be used, first, for river regulation, improvement of navigation, and flood control; second, for

irrigation and domestic uses; and; third, for power." (Not in U. S. Code.)

### 13.

Joint Resolution of March 2, 1938, 52 Stat. 83: "Joint Resolution Making an additional appropriation for relief purposes for the fiscal year ending June 30, 1938."

"*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That to continue to provide relief, and work relief on useful public projects, as authorized in the Emergency Relief Appropriation Act of 1937, and subject to all the provisions thereof, there is hereby appropriated, out of any money in the Treasury not otherwise appropriated, the sum of $250,000,000, which amount shall be added to, and proportionately increase the specified amounts of the limitations prescribed under, the appropriation made in such Act." (Not in U. S. Code.)

### 14.

Act of May 9, 1938, 52 Stat. 291 at pages 318, 319, and 324: "An Act Making appropriations for the Department of the Interior for the fiscal year ending June 30, 1939, and for other purposes."

"Bureau of Reclamation

\* \* \* \* \* \*

"\* \* \* not to exceed $20,000 \* \* \* payment of damages caused to the owners of lands or other private property of any kind by reason of the operations of the United States, its officers or employees; in the survey, construction, operation, or maintenance of irrigation works; \* \* \*

"General Fund, Construction

"For continuation of construction of the following projects and for general investigations in not to exceed the following amounts, respectively, to be expended from the general fund of the Treasury in the same manner and for the same objects of expenditures as specified for projects included hereinbefore in this Act under the caption 'Bureau of Reclamation', and to be reimbursable (except as to the Colorado

River project, Texas) under the reclamation law:

"Central Valley project, California, $9,-000,000, together with the unexpended balance of the appropriation for this project contained in the Interior Department Appropriation Act, fiscal year 1938, with authority in connection with the construction of the Central Valley project, California, (1) to purchase or condemn and to improve suitable land for relocation of highways, roadways, railroads, telegraph, telephone, or electric transmission lines or other properties the relocation of which, in the judgment of the Secretary of the Interior, will be necessitated by construction or operation and maintenance of said project, (2) in full or part payment for said properties to be relocated, to enter into contracts with the owners of said properties to be relocated whereby they undertake in whole or in part the property acquisition and work involved in relocation and, in said Secretary's discretion, to pay in advance for said work undertaken by said owners; and (3) to convey or exchange acquired rights-of-way or other lands or rights-of-way owned or held by the United States for use in connection with said project, or to grant perpetual easements therein or thereover, or to undertake improvement or construction work connected with said relocations for the purpose of effecting completely said relocations." (Not in U. S. Code.)

### 15.

Joint Resolution of June 21, 1938, 52 Stat. 809, 811, 816: "Joint Resolution Making appropriations for work relief, relief, and otherwise to increase employment by providing loans and grants for public works projects."

"Section 1. That in order to continue to provide work relief on useful public projects, and relief \* \* \* there is hereby appropriated \* \* \* to remain available until June 30, 1939, as follows:

"(1) To the Works Progress Administration, $1,425,000,000, \* \* \* and such amounts shall be available for \* \* \* (d) the following types of public projects \* \* \* namely \* \* \* (2) \* \* \*

flood control; drainage; irrigation; conservation * * *

"Section 5. No Federal construction project, except flood control and water conservation projects authorized under other law, shall be undertaken or prosecuted under the appropriations in this title unless and until there shall have been allocated and irrevocably set aside Federal funds sufficient for its completion; * * *

"Title II—Public Works Administration Projects

"Sec. 201. (a) In order to increase employment by providing for useful public works projects of the kind and character which the Federal Emergency Administrator of Public Works * * * has heretofore financed or aided in financing * * * there is hereby appropriated * * * the sum of $965,000,000 to be expended by such Administrator, subject to the approval of the President, for (1) the making of allotments to finance Federal projects, * * * or (3) the construction and leasing of projects. * * *" (Not in U. S. Code.)

### 16.

Act of May 10, 1939, 53 Stat. 685, at pages 714 and 719: "An Act Making appropriations for the Department of the Interior for the fiscal year ending June 30, 1940, and for other purposes."

"The following sums are appropriated out of the special fund in the Treasury of the United States created by the Act of June 17, 1902 (43 U.S.C. 391, 411), and therein designated 'the reclamation fund', to be available immediately".

"Central Valley project, California $10,-000,000: Provided, That this appropriation and the unexpended balances of appropriations heretofore made for the construction of this project shall be available until expended and shall be accounted for as one fund, entitled 'Central Valley project, California';". (Not in U. S. Code.)

### 17.

Act of August 4, 1939, 53 Stat. 1187, 1192, 1194, 1197: "An Act To provide a feasible and comprehensive plan for the variable payment of construction charges on United States reclamation projects, to protect the investment of the United States in such projects, and for other purposes." (Reclamation Project Act of 1939.)

(This Act as the title indicates covers requirements and nature of the contracts to be entered into for the repayment of the cost of the construction of federal reclamation projects. Pertinent parts as indicated by the various briefs of the parties are quoted below.)

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That for the purpose of providing for United States reclamation projects a feasible and comprehensive plan for an economical and equitable treatment of repayment problems and for variable payments of construction charges which can be met regularly and fully from year to year during periods of decline in agricultural income and unsatisfactory conditions of agriculture as well as during periods of prosperity and good prices for agricultural products, and which will protect adequately the financial interest of the United States in said projects, obligations to pay construction charges may be revised or undertaken pursuant to the provisions of this Act." (43 U.S.C.A. § 485.)

"Sec. 7 * * * (c) The Secretary from time to time shall report to the Congress on any proposed contracts negotiated pursuant to the authority of subsection (a) or (b) (1) of this section, and he may execute any such contract on behalf of the United States only after approval thereof has been given by Act of Congress. (43 U.S.C.A. § 485f(c) ).

\* \* \* \* \* \*

"Sec. 14. * * * The Secretary is further authorized, for the purpose of orderly and economical construction or operation and maintenance of any project, to enter into such contracts for exchange or replacement of water, water rights, or electric energy or for the adjustment of water rights, as in his judgment are necessary and in the interests of the United States and the project." (43 U.S.C.A. § 389.)

18.

Act of April 6, 1940, 54 Stat. 82, 87: "An Act Making appropriations to supply deficiencies in certain appropriations for the fiscal year ending June 30, 1940, to provide supplemental appropriations for such fiscal year, and for other purposes."

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the following sums are appropriated, out of any money in the Treasury not otherwise appropriated, to supply deficiencies in certain appropriations for the fiscal year ending June 30, 1940, to provide supplemental appropriations for such fiscal year, and for other purposes, namely:

\* \* \* \* \* \*

"For continuation of construction of the following projects in not to exceed the following amounts, respectively, to be expended from the general fund of the Treasury in the same manner and for the same objects of expenditure as specified for projects in the Interior Department Appropriation Act, 1940, under the caption, 'Bureau of Reclamation', fiscal year 1940, to remain available until expended, and to be reimbursable under the reclamation law;

"Central Valley project, California, $5,000,000; \* \* \*." (Not in U.S.Code.)

19.

Act of June 18, 1940, 54 Stat. 406, 432, 433, 437, 438: "An Act Making appropriations for the Department of Interior, for the fiscal year ending June 30, 1941, and for other purposes."

"Bureau Of Reclamation

"The following sums are appropriated out of the special fund in the Treasury of the United States created by the Act of June 17, 1902 (43 U.S.C. 391, 411), and therein designated 'the reclamation fund', to be available immediately:"

"Administrative provisions and limitations: For all expenditures authorized by the Act of June 17, 1902, and Acts amendatory thereof or supplementary thereto, known as the reclamation law, and all other Acts under which expenditures from said fund are authorized, \* \* \*

"General Fund, Construction

"For continuation of construction of the following projects and for administrative expenses in not to exceed the following amounts, respectively, to be expended from the general fund of the Treasury in the same manner and for the same objects of expenditures as specified for projects included hereinbefore in this Act under the caption 'Bureau of Reclamation' under the heading 'Administrative provisions and limitations', but without regard to the amounts of the limitations therein set forth, to be immediately available, to remain available until expended, and to be reimbursable (except as to the Pine River project, Colorado, and the Colorado River project, Texas) under the reclamation law:

"Parker Dam Power project, Arizona-California $3,500,000, together with the unexpended balance of the appropriation of $4,000,000 for this project contained in the Second Deficiency Appropriation Act, fiscal year 1939;

"Central Valley project, California $23,600,000;". (Not in U.S.Code.)

20.

Act of October 17, 1940, 54 Stat. 1198, 1199: "An Act Authorizing the improvement of certain rivers and harbors in the interest of the national defense, and for other purposes."

"Sec. 2 \* \* \* The second proviso in section 2 of the Act of August 26, 1937 (50 Stat. 844, 850), authorizing the construction, repair, and preservation of certain public works on rivers and harbors, and for other purposes, is hereby amended to read as follows: 'Provided further, That the entire Central Valley project, California, heretofore authorized and established under the provisions of the Emergency Relief Appropriation Act of 1935 (49 Stat. 115) and the First Deficiency Appropriation Act [of] 1936 (49 Stat. 1622) is hereby reauthorized and declared to be for the purposes of improving navigation, regulating the flow of the San Joaquin River and the Sacramento River, controlling floods, providing for the storage and for the delivery of the stored waters thereof, for construction under the provisions of the

Federal Reclamation Laws of such distribution systems as the Secretary of the Interior deems necessary in connection with lands for which said stored waters are to be delivered, for the reclamation of arid and semi-arid lands and lands of Indian reservations, and other beneficial uses, and for the generation and sale of electric energy as a means of financially aiding and assisting such undertakings * * *.'" (Not in U.S.Code.)

## 21.

Act of June 28, 1941, 55 Stat. 303 at pages 331 and 336: "An Act Making appropriations for the Department of the Interior for the fiscal year ending June 30, 1942, and for other purposes."

\* * * * * *

"Bureau Of Reclamation

"The following sums are appropriated out of the special fund in the Treasury of the United States created by the Act of June 17, 1902 (43 U.S.C. 391, 411), and therein designated 'the reclamation fund', to be available immediately:

* * * * * *

"General Fund, Construction

"For commencement and continuation of construction of the following projects and for general investigations and administrative expenses in not to exceed the following amounts, respectively, to be expended from the general fund of the Treasury in the same manner and for the same objects of expenditures as specified for projects included hereinbefore in this Act under the caption 'Bureau of Reclamation' under the heading 'Administrative provisions and limitations', but without regard to the amounts of the limitations therein set forth, to be immediately available, to remain available until expended, and to be reimbursable under the reclamation laws: * * * Central Valley project, California, $34,750,000". (Not in U.S.Code.)

## 22.

Act of July 30, 1941, 55 Stat. 612: "An Act For the acquisition of Indian Lands for the Central Valley project, and for other purposes." ; .

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That, in aid of the construction of the Central Valley project, authorized by the Acts of April 8, 1935 (49 Stat. 115), and August 26, 1937 (50 Stat. 850), there is hereby granted to the United States * * *" (provisions for acquiring such land are contained in remainder of Act). (Not in U.S.Code.)

## 23.

Act of Dec. 17, 1941, 55 Stat. 810, 826: "An Act Making supplemental appropriations for the national defense for the fiscal years ending June 30, 1942, and June 30, 1943, and for other purposes."

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the following sums are appropriated, out of any money in the Treasury not otherwise appropriated, for the national defense for the fiscal years ending June 30, 1942, and June 30, 1943, and for other purposes namely

* * * * * *

"Bureau Of Reclamation

" * * * General fund, construction: For continuation of construction of the following projects in not to exceed the following amounts, respectively, to be expended from the general fund of the Treasury in the same manner and for the same objects as specified for projects in the Interior Department Appropriation Act, 1942, under the caption 'Bureau of Reclamation', fiscal year 1942, to remain available until expended, and to be reimbursable under reclamation law:

"Central Valley project, California, $3,-000,000". (Not in U. S. Code.)

## 24.

Act of July 8, 1942, 56 Stat. 650: "An Act To authorize the use of a tract of land in California known as the Millerton Rancheria in connection with the Central Valley project, and for other purposes."

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That

there is hereby authorized to be used for any and all purposes in connection with the Central Valley project in California, as authorized by the Acts of April 8, 1935 (49 Stat. 115), and August 26, 1937 (50 Stat. 850), the following-described land situated in the county of Madera, State of California:" (description of property and availability of funds for acquisition follow). (Not in U. S. Code.)

25.

Act of July 12, 1943, 57 Stat. 451, at pages 472 and 476: "An Act Making appropriations for the Department of the Interior for the fiscal year ending June 30, 1944, and for other purposes."

\* \* \* \* \* \*

"Bureau Of Reclamation

"The following sums are appropriated out of the special fund in the Treasury of the United States created by the Act of June 17, 1902 (43 U.S.C. 391, 411), and therein designated 'the reclamation fund', to be available immediately: \* \* \*

"For all expenditures authorized by the Act of June 17, 1902, and Acts amendatory thereof or supplementary thereto, known as the reclamation law, \* \* \*

"General Fund, Construction

"For continuation of construction of the following projects \* \* \* to be immediately available, to remain available until expended, and to be reimbursable under the reclamation law:

\* \* \* \* \* \*

"Central Valley project, California, Shasta Dam, Reservoir, and power plant, $10,-900,000; Keswick Dam and power plant, $1,474,000; Friant Dam and Reservoir, $595,000; transmission line to Shasta substation, $400,000; Friant-Kern Canal, $7,-000,000; Madera Canal, $1,000,000; Contra Costa Canal, $500,000; Contra Costa laterals, $500,000; and examinations, surveys, and water rights, $200,000; in all, $22,569,-000; \* \* \*." (Not in U. S. Code.)

26.

Act of June 28, 1944, 58 Stat. 463, at pages 486, 487: "An Act Making ap-

propriations for the Department of the Interior for the fiscal year ending June 30, 1945, and for other purposes."

"Bureau Of Reclamation

"The following sums are appropriated out of the special fund in the Treasury of the United States created by the Act of June 17, 1902 (43 U.S.C. 391, 411), and therein designated 'the reclamation fund', to be available immediately:

\* \* \* \* \* \*

"Central Valley project, California: Not to exceed $400,000 from power revenues shall be available for the operation and maintenance of the power system". (Not in U.S.Code.)

27.

Act of Dec. 22, 1944, 58 Stat. 887, at pages 888, 889, 890, 891, and 901: "An Act Authorizing the construction of certain public works on rivers and harbors for flood control, and for other purposes."

"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* In connection with the exercise of jurisdiction over the rivers of the Nation through the construction of works of improvement, for navigation or flood control, as herein authorized, it is hereby declared to be the policy of the Congress to recognize the interests and rights of the States in determining the development of the watersheds within their borders and likewise their interests and rights in water utilization and control, as herein authorized to preserve and protect to the fullest possible extent established and potential uses, for all purposes, of the waters of the Nation's rivers; to facilitate the consideration of projects on a basis of comprehensive and coordinated development; and to limit the authorization and construction of navigation works to those in which a substantial benefit to navigation will be realized therefrom and which can be operated consistently with appropriate and economic use of the waters of such rivers by other users.

"In conformity with this policy:

"(a) Plans, proposals, or reports of the Chief of Engineers, War Department, for

any works of improvement for navigation or flood control not heretofore or herein authorized [1], shall be submitted to the Congress only upon compliance with the provisions of this paragraph (a). Investigations which form the basis of any such plans, proposals, or reports shall be conducted in such a manner as to give to the affected State or States, during the course of the investigations, information developed by the investigations and also opportunity for consultation regarding plans and proposals, and, to the extent deemed practicable by the Chief of Engineers, opportunity to cooperate in the investigations. If such investigations in whole or part are concerned with the use or control of waters arising west of the ninety-seventh meridian, the Chief of Engineers shall give to the Secretary of the Interior, during the course of the investigations, information developed by the investigations and also opportunity for consultation regarding plans and proposals, and to the extent deemed practicable by the Chief of Engineers, opportunity to cooperate in the investigations. The relations of the Chief of Engineers with any State under this paragraph (a) shall be with the Governor of the State or such official or agency of the State as the Governor may designate. The term 'affected State or States' shall include those in which the works or any part thereof are proposed to be located; those which in whole or part are both within the drainage basin involved and situated in a State lying wholly or in part west of the ninety-eighth meridian; and such of those which are east of the ninety-eighth meridian as, in the judgment of the Chief of Engineers, will be substantially affected. Such plans, proposals, or reports and related investigations shall be made to the end, among other things, of facilitating the coordination of plans for the construction and operation of the proposed works with other plans involving the waters which would be used or controlled by such proposed works. Each report submitting any such plans or proposals to the Congress shall set out therein, among other things, the relationship between the plans for construction and operation of the proposed works and the plans, if any, submitted by the affected States and by the Secretary of the Interior. The Chief of Engineers shall transmit a copy of his proposed report to each affected State, and, in case the plans or proposals covered by the report are concerned with the use or control of waters which rise in whole or in part west of the ninety-seventh meridian, to the Secretary of the Interior. Within ninety days from the date of receipt of said proposed report, the written views and recommendations of each affected State and of the Secretary of the Interior may be submitted to the Chief of Engineers. The Secretary of War shall transmit to the Congress, with such comments and recommendations as he deems appropriate, the proposed report together with the submitted views and recommendations of affected States and of the Secretary of the Interior. The Secretary of War may prepare and make said transmittal any time following said ninety-day period. The letter of transmittal and its attachments shall be printed as a House or Senate document.

"(b) The use for navigation, in connection with the operation and maintenance of such works herein authorized for construction, of waters arising in States lying wholly or partly west of the ninety-eighth meridian shall be only such use as does not conflict with any beneficial consumptive use, present or future, in States lying wholly or partly west of the ninety-eighth meridian, of such waters for domestic, municipal, stock water, irrigation, mining, or industrial purposes."

"Sec. 2. That the words 'flood control' as used in section 1 of the Act of June 22, 1936, shall be construed to include channel and major drainage improvements, and that hereafter Federal investigations and improvements of rivers and other waterways for flood control and allied purposes shall be under the jurisdiction of and shall be prosecuted by the War Department under the direction of the Secretary of War and supervision of the Chief of Engineers, and

---

[1]. That is to say: any works of improvement for navigation or flood control authorized after the date of this Act, such as diversionary works, etc.

Federal investigations of watersheds and measures for run-off and water-flow retardation and soil-erosion prevention on watersheds shall be under the jurisdiction of and shall be prosecuted by the Department of Agriculture under the direction of the Secretary of Agriculture, except as otherwise provided by Act of Congress." (33 U.S.C.A. § 701a—1.)

\* \* \* \* \* \*

"Sec. 6. That the Secretary of War is authorized to make contracts with States, municipalities, private concerns, or individuals, at such prices and on such terms as he may deem reasonable, for domestic and industrial uses for surplus water that may be available at any reservoir under the control of the War Department: *Provided,* That no contracts for such water shall adversely affect then existing lawful uses of such water. All moneys received from such contracts shall be deposited in the Treasury of the United States as miscellaneous receipts." (33 U.S.C.A. § 708.)

\* \* \* \* \* \*

"Sec. 8. Hereafter, whenever the Secretary of War determines, upon recommendation by the Secretary of the Interior that any dam and reservoir project operated under the direction of the Secretary of War may be utilized for irrigation purposes, the Secretary of the Interior is authorized to construct, operate, and maintain, under the provisions of the Federal reclamation laws (Act of June 17, 1902, 32 Stat. 388, and Acts amendatory thereof or supplementary thereto), such additional works in connection therewith as he may deem necessary for irrigation purposes. Such irrigation works may be undertaken only after a report and findings thereon have been made by the Secretary of the Interior as provided in said Federal reclamation laws and after subsequent specific authorization of the Congress by an authorization Act; and, within the limits of the water users' repayment ability such report may be predicated on the allocation to irrigation of an appropriate portion of the cost of structures and facilities used for irrigation and other purposes. Dams and reservoirs operated under the direction of the Secretary of War may be utilized hereafter for ir-

rigation purposes only in conformity with the provisions of this section, but the foregoing requirement shall not prejudice lawful uses now existing: *Provided,* That this section shall not apply to any dam or reservoir heretofore constructed in whole or in part by the Army engineers, which provides conservation storage of water for irrigation purposes." (43 U.S.C.A. § 390.)

"Sec. 9. (a) The general comprehensive plans set forth in House Document 475 and Senate Document 191, Seventy-eighth Congress, second session, as revised and coordinated by Senate Document 247, Seventy-eighth Congress, second session, are hereby approved and the initial stages recommended are hereby authorized and shall be prosecuted by the War Department and the Department of the Interior as speedily as may be consistent with budgetary requirements.

\* \* \* \* \* \*

"(c) Subject to the basin-wide findings and recommendations regarding the benefits, the allocations of costs and the repayments by water users, made in said House and Senate documents, the reclamation and power developments to be undertaken by the Secretary of the Interior under said plans shall be governed by the Federal Reclamation Laws (Act of June 17, 1902, 32 Stat. 388, and Acts amendatory thereof or supplementary thereto), except that irrigation of Indian trusts and tribal lands, and repayment therefor, shall be in accordance with the laws relating to Indian lands.

\* \* \* \* \* \*

"San Joaquin River

\* \* \* \* \* \*

"The plan of improvement for local flood protection on various streams in the Merced County Stream Group in the San Joaquin Valley is hereby authorized substantially in accordance with the recommendations of the Chief of Engineers in House Document Numbered 473, Seventy-eighth Congress, second session, at an estimated cost of $1,300,000."

"The plan of improvement for flood control and other purposes on the Lower San Joaquin River and tributaries, including

Tuolumne and Stanislaus Rivers, in accordance with the recommendations of the Chief of Engineers in Flood Control Committee Document Numbered 2, Seventy-eighth Congress, second session, is approved, and there is hereby authorized $8,-000,000 for initiation and partial accomplishment of the plan."

28.

Act of July 3, 1945, 59 Stat. 318, at pages 338, 339, and 342: "An Act Making appropriations for the Department of the Interior for the fiscal year ending June 30, 1946, and for other purposes."

"Bureau Of Reclamation

"Administrative provisions: Sums appropriated in this Act for the Bureau of Reclamation shall be available for all expenditures authorized by the Act of June 17, 1902, and Acts amendatory thereof or supplementary thereto, known as reclamation law, and all other Acts under which expenditures are authorized, * * *.

* * * * * *

"The following sums are appropriated out of the special fund in the Treasury of the United States created by the Act of June 17, 1902 (43 U.S.C. 391, 411), and therein designated 'the reclamation fund', to be available immediately:

* * * * * *

"General Fund, Construction

"For continuation of construction of the following projects in not to exceed the following amounts to be immediately available, to remain available until expended for carrying out projects (including the construction of transmission lines) previously or herein authorized by Congress, and to be reimbursable under the reclamation law:".

29.

Act of December 28, 1945, 59 Stat. 632, at page 647: "An Act Making appropriations * * * for the fiscal year ending June 30th, 1946, and for prior fiscal years, to provide supplemental appropriations for the fiscal year ending June 30th, 1946, and for other purposes."

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the following sums are appropriated out of any money in the Treasury not otherwise appropriated to supply deficiencies in certain appropriations for the fiscal year ending June 30, 1946.

* * * * * *

"Bureau of Reclamation

* * * * * *

"Central Valley Project, California:

"Storage system, Shasta Dam and Reservoir, relocation of secondary roads, $100,-000; road between Shasta and Keswick Dams and United States Highway 99, $150,-000; clearing Shasta Reservoir area, $100,-000; Shasta Dam $500,000; Delta division, Delta-Mendota canal, $7,500,000; Delta Cross channel $349,420; Friant division, Friant Dam and Reservoir, $200,000; Friant-Kern canal $6,000,000; * * *." (Not in U. S. Code.)

30.

Act of August 14, 1946, 60 Stat. 1080, at page 1081 "An act To amend the Act of March 10, 1934, entitled 'An Act to promote the conservation of wildlife, fish, and game, and for other purposes'."

* * * * * *

"Sec. 3. Whenever the waters of any stream or other body of water are *impounded, diverted,* or *otherwise controlled for* any purpose whatever by any department or agency of the United States, *adequate provision* consistent with the *primary purposes* of such impoundment, diversion, or other control shall be made for the use thereof, together with any areas of land, or interest therein, acquired or administered in connection therewith, for the conservation, maintenance, and management of wildlife, resources thereof, and its habitat thereon. In accordance with general plans, covering the use of such waters and other interests for these purposes, approved jointly by the head of the department or agency exercising primary administration thereof, the Secretary of the Interior, and the head of the agency exercising administration over

the wildlife resources of the State wherein the waters and areas lie, such waters and other interests shall be made available without cost for administration (a) by such State agency, if the management thereof for the conservation of wildlife relates to other than migratory birds; (b) by the Secretary of the Interior, if the waters and other interests have particular value in carrying out the national migratory bird management program." (16 U.S.C.A. § 663.)

Section 4 then provides for the administration of available areas, ending with "*Provided,* That such rules and regulations shall not be inconsistent with the laws for the protection of fish and game of the States in which such area is situated." (16 U.S.C.A. § 664.)

## 31.

Act of July 25, 1947, 61 Stat. 460, at page 475: "An Act Making appropriations for the Department of the Interior for the fiscal year ending June 30, 1948, and for other purposes."

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress Assembled, That: the following sums are appropriated, out of any money in the Treasury not otherwise appropriated, for the Department of the Interior for the fiscal year ending June 30, 1948, namely:

\* \* \* \* \* \*

"Central Valley project, California; joint facilities, $690,000; irrigation facilities $5,622,028; power facilities, Shasta power plant, $427,800, Keswick Dam, $100,740, Keswick power plant, $218,040; transmission lines, Shasta to Delta, via Oroville and Sacramento, two hundred and thirty kilovolt $256,680, Shasta Dam to Shasta substation two hundred and thirty kilovolt $1,500,000, Keswick tap line, two hundred and thirty kilovolt $160,000, Contra Costa Canal extension, sixty-nine kilovolt $118,000; substation, Contra Costa, $48,000; in all $9,141,288." (Not in U. S. Code.)

## Appendix B

Article XIV, California Constitution

"Sec. 3. Conservation Of Water. It is hereby declared that because of the conditions prevailing in this State the general welfare requires that the water resources of the State be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation of such waters is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare. The right to water or to the use or flow of water in or from any natural stream or watercourse in this State is and shall be limited to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water. Riparian rights in a stream or watercourse attach to, but to no more than so much of the flow thereof as may be required or used consistently with this section, for the purposes for which such lands are, or may be made adaptable, in view of such reasonable and beneficial uses; provided, however, that nothing herein contained shall be construed as depriving any riparian owner of the reasonable use of water of the stream to which his land is riparian under reasonable methods of diversion and use, or of depriving any appropriator of water to which he is lawfully entitled. This section shall be self-executing and the Legislature may also enact laws in the furtherance of the policy in this section contained. [New section added by amendment adopted November 6, 1928.] "

## Appendix C

The Secretary of the Interior
Washington
November 26, 1935

"The President
The White House.

"My dear Mr. President:

"The Supreme Court of the United States in the Parker Dam decision (United States v. State of Arizona, 295 U.S. 174 [55 S.Ct. 666, 79 L.Ed. 1371] ) indicated that Section 4 of the Act of June 25, 1910 (36 Stat. 835), is applicable to irrigation projects constructed under the National

Industrial Recovery Act and this report on the Central Valley project, California, is made to you under said statute of 1910 and under subsection B of Section 4 of the Act of December 5, 1924 (43 Stat. 702).

"Section 4 of the Act of June 25, 1910 (36 Stat. 835), provides, in effect, that after the date of that act no irrigation project to be constructed under the Act of June 17, 1902 (32 Stat. 388), and acts amendatory thereof or supplementary thereto, shall be undertaken unless and until the project shall have been recommended by the Secretary of the Interior and approved by the direct order of the President.

"Subsection B, Section 4, Act of December 5, 1924 (43 Stat. 702) provides as follows:

" 'That no new project or new division of a project shall be approved for construction or estimates submitted therefor by the Secretary until information in detail shall be secured by him concerning the water supply, the engineering features, the cost of construction, land prices, and the probable cost of development, and he shall have made a finding in writing that it is feasible, that it is adaptable for actual settlement and farm homes, and that it will probably return the cost thereof to the United States.'

### "General Description of Project.

"The Central Valley project embodies a plan for the conservation, regulation, distribution and utilization of the water resources of the Sacramento and San Joaquin rivers to provide urgently needed water supplies for existing agricultural, industrial and municipal developments in the Sacramento and San Joaquin valleys and upper San Francisco Bay region which contain 3,000,000 acres of settled, irrigated and productive land, and a population of 90,000 persons. In addition to providing new water supplies to meet serious problems of water shortage, the project contemplates the restoration of commercial navigation on the upper Sacramento River, increased flood protection for the valley lands, and incidentally the generation of about a billion and a half kilowatt hours annually of hydroelectric energy.

"The key unit of the project is Kennett Reservoir on the Sacramento River. A dam 420 feet high will regulate floods and store three million acre-feet of water. Water released from the reservoir, after generating hydroelectric power, will flow down the Sacramento River, maintaining adequate depths for navigation and furnishing ample supplies for irrigation, municipal and industrial use along the main river and in the fertile delta region of the Sacramento and San Joaquin rivers. Intrusion of salt water from the bay into the delta channels—a frequent occurrence in recent years causing substantial loss in crops and threatening destruction of productivity—will be prevented by the released waters. In addition water supplies will be made available in the delta channels for various uses in the nearby upper San Francisco Bay area, and for utilization in the San Joaquin Valley. Conduits to carry the supplies to these areas are provided. The supply for the San Joaquin Valley will be conveyed up the San Joaquin River through a series of pumping plants and intervening natural and artificial channels a distance of 150 miles lifting the water to an elevation of 160 feet above sea level. This water will replace San Joaquin River water now used for irrigation in the northern San Joaquin Valley, thus permitting the entire flow of the San Joaquin River to be regulated in Friant Reservoir—the second storage unit of the project—and to be utilized in the southern San Joaquin Valley where local supplies are deficient. Water from this reservoir will be delivered by gravity through conduits extending northerly and southerly to serve developed irrigated lands in an area extending from Madera County on the north to Kern County on the south.

"The cost of the project, estimated at $170,000,000, will be met by revenues from the sale of water and power.

### "Water Supply

"The sources of water supply for the project are the Sacramento and San Joaquin Rivers and their tributaries. The

State of California, pursuant to acts of the State Legislature has filed notices of appropriation on the principal streams, which are in good standing. Water supplies studies made by the Department of Public Works of California, U. S. War Department and the U. S. Bureau of Reclamation, indicate on the basis of available data that the works of the project will provide an adequate water supply for all purposes.

"Engineering Features

"The principal engineering features of the project are as follows:

"Kennett Dam Unit—the Kennett reservoir, the key unit of the project, is located in the Sacramento River near Redding in Shasta County. The dam will be 420 feet high and store 3,000,000 acre feet of water. A 175,000 k. v. a. power plant will be located below the dam. A regulating afterbay with a 50,000 k. v. a. power plant will be constructed below the Kennett dam. From the power plants a 200 mile power transmission line will extend to a main distributing substation near Antioch or Suisun Bay.

"Contra Costa Conduit—A canal, capacity 120 second feet, with pumping plants, will extend westerly from the San Joaquin delta for 50 miles through Contra Costa County to supply municipal, industrial and agricultural water requirements.

"San Joaquin Pumping System—The works for this pumping system will comprise a dam and other works in Sacramento delta to divert stored water from Kennett reservoir through a channel into San Joaquin delta for salinity control, irrigation and other purposes; dredging of existing channels in the San Joaquin delta; five dams and pumping plants on San Joaquin River to mouth of Merced River; and four pumping plants and 65 miles of canal on the westerly side of San Joaquin Valley which will deliver water to Mendota Weir on San Joaquin River, elevation 160 feet. These works will be capable of furnishing a substituted supply of $1,000,000 acre-feet to 285,000 acres of land now irrigated from San Joaquin River.

"Friant Reservoir—A dam, 250 feet high, will be constructed on San Joaquin River, which will store 400,000 acre-feet of water which will permit the diversion of San Joaquin River water southward at elevation 467 feet. One and one-half million acre-feet annually on the average will be available for transmission from the reservoir through the means of the San Joaquin River Pumping System and the purchase of water rights in the San Joaquin River.

"Friant-Kern Canal—The Friant Kern Canal will extend from Friant Reservoir to Kern River, a distance of 157 miles and will be capable of serving an area of 1,000,-000 acres of developed land.

"Madera Canal—The Madera Canal, maximum capacity 1500 second-feet, will extend from Friant reservoir to Chowchilla River, a distance of 35 miles and will be capable of furnishing irrigation water to an area of 140,000 acres.

"Estimated Cost of Project

| | |
|---|---|
| Kennett dam, reservoir and power plants | $ 84,000,000 |
| Kennett transmission line and substation | 14,000,000 |
| Contra Costa Conduit | 2,500,000 |
| San Joaquin Pumping System | 19,000,000 |
| Friant dam and reservoir | 14,000,000 |
| Friant-Kern Canal | 26,000,000 |
| Madera Canal | 3,000,000 |
| Rights of way, water rights and general expenses | 8,000,000 |
| Total | $170,000,000 |

"First Year Construction Program.

"Under date of September 10, 1935, you approved an allocation of $20,000,000 for the Central Valley Project, which amount was later reduced to $15,000,000. Construction on the following units is recommended for the first year:

"Kennett Reservoir Unit Contra Costa Conduit"

Friant Dam and Canals.

"An amount of $15,000,000 can be efficiently and economically expended on the foregoing units during the first year of construction.

"Adaptability of Land for Irrigation,

### Crop Production and Settlement

"The climate is favorable and the soil, if water is available, is adaptable to the production of a wide variety of crops. The principle crops now raised in the San Joaquin Valley are citrus and deciduous fruits, grapes, alfalfa, cotton, nuts, and figs; in the Delta, asparagus, celery, potatoes as well as deciduous fruits; and in the Sacramento Valley there is a heavy production of rice in addition to other grains and deciduous fruits.

"The valley is highly developed. The lands are of high value and produce large returns. With an attractive climate, fertile soil and stable markets, water is the one remaining necessity to prosperous, successful agricultural industry. It has been highly successful and supports a large farm population. Much of the fruit is shipped to eastern markets but many other items, such as the products of dairying, are marketed within the state and reduce the quantities, imported into the state. Products are largely non-competitive with other sections of the country, since many of them, such as nuts, figs, raisins, asparagus, are produced almost wholly in California.

"Transportation facilities are excellent. These include railroads and improved highways leading to the Metropolitan center of Los Angeles and San Francisco and to eastern markets.

"The project is not designed for bringing new lands into cultivation, but for the maintenance of existing agricultural development and existing civilization of a high type. Any increase in irrigated land will be small and will come into being slowly over a long period of time. Part of the water supply is to be obtained by the purchase of water now used for the irrigation of pasture lands and this will result in the retirement from use of 250,000 acres of submarginal land, as compared to a small and gradual increase of irrigated land.

### "Social and Economic Values.

"The economic values of the project are of great magnitude. The project will not bring into production new agricultural areas but will maintain present values and civilization. Of the 3,000,000 acres now irrigated, 1,000,000 face acute water shortage, and abandonment is proceeding rapidly. The values in jeopardy are large, as without water, not only will lands dry up but communities will vanish and whole sections return to desert, as is now occurring in the San Joaquin Valley. A share of the loss will be suffered by persons not residing in the areas directly affected.

"Control of salinity in the delta of the two rivers near Sacramento is part of the agricultural maintenance phase of the project. Here 400,000 irrigated acres with an annual crop value of $30,000,000 are menaced by salt water from upper San Francisco Bay. Some abandonment has occurred and the whole area is endangered. In this same general area is a large industrial section which is also short of water by reason of increasing salinity. Here 100 industrial plants produce annually $100,000,000 value of manufactured products, and while not facing extinction, are suffering damage and expense from lack of water.

"Navigation on the Sacramento River, one of the important waterways of the nation, has been greatly damaged by low water, navigation having been practically abandoned above Sacramento in the summer season. The national navigation and flood values of the project have been found by the War Department to be $12,000,000, and the recently enacted Rivers and Harbors Bill (Public No. 409, 74th Congress), by reference to the War Department report approves the project and authorizes the appropriation of $12,000,000 for it.

"A large power house at the main storage dam will produce nearly a billion and a half kilowatt hours of electric energy annually, which will be sold at less than existing rates, thereby benefiting power users and at the same time producing a large revenue, which will go toward the repayment of the construction costs.

### "Probable Return to Reclamation Fund of Cost of Construction.

"The next declaration required is that the cost of construction will probably be returned to the Federal Government. This is interpreted to mean that it will be re-

turned within forty years from the time the Secretary issues public notice that water is available from the project works. The estimated cost of construction is $170,-000,000 and the annual cost, including repayment of all other charges is $7,500,000. It is estimated that annual revenues from the sale of water and of electric power will be sufficient to cover these charges. The favorable conditions heretofore recited justify the belief that the project will return its cost.

"I find that the project is feasible from engineering, agricultural and financial standpoints, that it is adaptable for settlement and farm homes, that the estimated construction cost is adequate and that the anticipated revenues will be sufficient to return the cost to the United States.

"The Commissioner of Reclamation has approved and recommended the construction of the project. I therefore recommend the approval of the Central Valley development as a Federal reclamation project.

"Sincerely yours,
"(Sgd.) Harold L. Ickes,
"Secretary of the Interior.
"Approved: Dec. 2, 1935.
"Franklin D. Roosevelt.
"President."

## Appendix D.

Judge Hall: Mr. Boyd, on your proposition that if this is an aid of navigation and these parties have no rights, cannot this court take judicial notice of the fact that in one of the cases it is reported that the United States paid Miller & Lux something like $2,000,000 for their water rights? Now if Congress could take that why did they pay them money? Why have they offered money to some of the people in this area if they are entitled to take it without paying any money for it? Is it a gratuity?

Mr. Boyd: They not only offered to pay but they have in some instances actually paid.

Judge Hall: They have done that, have they not, because Congress has said, whenever it is necessary to acquire any water rights you shall acquire them by purchase or eminent domain?

Mr. Boyd: Are you speaking of the authorizing legislation for the Central Valley Project?

Judge Hall: I am speaking of the payments that were made for the acquisition of water rights which have been acquired in connection with the construction of the Central Valley Project. In other words, the Department has regarded the basic reclamation law as applicable.

Mr. Boyd: No, your Honor, I have to differ with you on that for this reason * * *

Judge Hall: Then under what basis of law did they pay the money?

Mr. Boyd: The basis was that the appropriation was available for the Central Valley Project. The only explanation that is to be found anywhere about why the payment was made is in the testimony of the then Commissioner of Reclamation, John C. Page, before a House Appropriations Committee in which, in substance, he said that the project was an emergency one and that they feared that Miller & Lux, if not paid off, because they were large, wealthy and powerful interests, would keep the project tied up in litigation for years and so defeat its purposes.

He did say in addition * * *

Judge Hall: Surely Congress has not authorized the payment of blackmail money, have they?

Mr. Boyd: No, I don't think so.

He did say at the same time that it appeared that they had rights in the river and then despite the clear provisions of both the authorizing Act of 1937 and Section 7 of the Reclamation Act of 1902 authorizing the acquisition by condemnation of any rights necessary for the project, he said that he felt that Miller & Lux could defeat us because they had no authority to take the water out of the watershed and no such limitation whatsoever appears in either statute.

Now that is the only explanation of that payment that we have been able to find anywhere.